**GENERAL MOTORS CORPORATION et al.
v. FEDERAL TRADE COMMISSION.**

No. 404.

Circuit Court of Appeals, Second Circuit.

Aug. 12, 1940.

John Thomas Smith, of New York City (Anthony J. Russo, of New York City, of counsel), for petitioners.

W. T. Kelley, Chief Counsel, Martin A. Morrison, Asst. Chief Counsel, James M. Hammond, and James W. Nichol, all of Washington, D. C., for respondent Federal Trade Commission.

Before AUGUSTUS N. HAND and CHASE, Circuit Judges, and LEIBELL, District Judge.

AUGUSTUS N. HAND, Circuit Judge.

This is a petition by the General Motors Corporation and two of its wholly-owned subsidiaries, General Motors Sales Corporation and General Motors Acceptance Corporation, to review an order requiring them to cease and desist from the use of the socalled 6% plan in marketing automobiles manufactured by General Motors Corporation and sold on instalment to the public. At first the cars made by the latter corporation were sold by it to its five subsidiaries, Chevrolet Motor Company, Olds Motor Works, Pontiac Motor Company, Buick Motor Company and Cadillac Motor Company, and then sold by them to dealers in the various states, who in turn sold to the public. The Federal Trade Commission issued a complaint against General Motors Corporation, General Motors Acceptance Corporation and the above five subsidiaries of the former who had been selling cars to dealers who used the Acceptance Corporation's 6% plan. Shortly afterwards these five companies were dissolved and General Motors Sales Corporation took their place as a wholesale instrumentality in marketing the cars, and was then made a party to the proceeding.

The general course of business was (1) manufacture of the cars by the General Motors Corporation, (2) transfer and sale of the cars to the one of the five subsidiary companies whose name was identified with the model sold, and (3) sale by the latter to the dealers. After General Motors Sales Corporation was organized and the above five subsidiaries were dissolved, the Sales Corporation took the place of each one of the companies as transferee of title and possession and acted as selling agent for General Motors Corporation to the dealers.

In connection with the sales by the five subsidiaries and afterwards by the subsidiary Sales Corporation the socalled 6% plan was used in most cases where the purchasing public bought cars under the instalment plan. The General Motors Acceptance Corporation (hereafter referred to as GMAC) was organized by General Motors to finance retail instalment (time) sales made by dealers to retail buyers. It financed not only instalment purchases of cars but also purchases of other products in the automobile business which were manufactured by General Motors. It did this by making a contract with the dealer whereby

the balance due under the instalment contract was secured by a conditional sale agreement and payments in reduction of the balance were made monthly over a series of from 6 to 18 months. In the autumn of 1935 the plan of financing the purchase of the several brands of motor vehicles on the 6% instalment payment plan was first advertised through General Motors Acceptance Corporation in the newspapers. The Commission made the following findings as to the plan here involved:

"The initial advertisement was as follows:

## "GMAC

"General Motors Acceptance Corporation Reduces Time Payment Costs on New Cars

### With a new 6% Plan

| Simple as A, B, C |
| --- |
| (A—Take Your Unpaid Balance ) |
| (B—Add Cost of Insurance ) |
| (C*—Multiply by 6%—12 months' plan) |
| ( (One-half of one percent per month ) |
| (for periods more or less than 12 ) |
| (months) That's your *whole* financing) |
| (cost. No extras. No service fees. ) |
| (No other charges. ) |

"GMAC announces today a new, economical way to buy any new General Motors car from General Motors dealers all over the United States.

"It's the plan you've been waiting for—a plan you can understand at a glance. It is far simpler and more economical than any other automobile time payment arrangement you've ever tried.

"Actually as simple as A, B, C—this new plan provides for convenient time payments of the unpaid balance on your car—including cost of insurance and a financing cost of 6%. This represents a considerable reduction in the cost of financing car purchases. It is not 6% interest, but simply a convenient multiplier anyone can use and understand. Nothing is added in the way of so-called service or carrying charges. There are no extras. Simply a straightforward, easy-to-understand transaction.

"This simple step brings the world's finest cars within reach of thousands who have long needed new cars. When you buy a new Cadillac or Buick, Chevrolet or Pontiac, Oldsmobile or LaSalle, on this new plan, you actually save money!

"And finally—buyers under this new plan receive an insurance policy in the General Exchange Insurance Corporation which protects them against Fire, Theft, and Accidental Damage to their cars.

(Block here asking owners to make comparison with other finance plans.)
Offered Only by Dealers in
Chevrolet Cars & Trucks—Pontiac—
Oldsmobile—Buick—LaSalle—Cadillac"
*   *   *   *   *

"Following the appearance of this advertising matter many similar advertisements were published both by GMAC and by the other five selling subsidiaries of respondent, to wit, the Chevrolet, Pontiac, Olds, Buick and Cadillac Companies. Some of them gave an extended explanation of the '6%' plan, such as is given in the advertisement quoted in full above, but most of them did not and confined themselves to a short reference to the '6%' plan. Typical references to the '6%' plan in these advertisements are as follows:

"Chevrolet:
" 'Compare Chevrolet's low delivered prices and the new, greatly reduced GMAC 6% Time Payment Plan.'
"Pontiac:
" 'All Pontiac cars can be bought on GMAC's new 6% Plan which greatly reduces the cost of buying on time.'
"Olds:
" 'New 6% GMAC Time Payment Plan.'
"Buick:
" 'The new GMAC 6% Time Payment Plan not only simplifies financing but actually cuts the cost of buying a car on time.'
"LaSalle:
" 'Available on GMAC's new 6% Time Payment Plan.'
"Cadillac:
" 'Available on GMAC's new 6% time payments.'

"In addition to these advertisements, the '6%' plan was highly publicized by the use of billboards and window posters. In many of these advertisements the symbol '6%' was featured in a size far greater than most of the other lettering in the advertisement. All of these advertisements were paid for by GMAC or the other selling subsidiaries of General Motors as indicated herein, entirely from their own funds or from a fund known as the 'dealers' fund,' which was collected and controlled by the

---

*In some States a small legal documentary fee is required.

selling subsidiaries. Money for the 'dealers' fund' was raised by billing the dealers a specified amount in the invoice pertaining to each car sold to them. This charge was in turn passed along to the retail purchaser by the dealer. Neon signs featuring the term '6%' were also made available by said subsidiaries to dealers as were mats and sample advertisements for use in inserting advertisements in local newspapers, magazines or circulars, at the dealer's expense.

"The function and purpose of all of this advertising, including that published by GMAC, was to promote and further the sale to the purchasing public of new cars manufactured by General Motors."

On succeeding the five dissolved corporations, the General Motor Sales Corporation carried on their business as before, the business of the dissolved companies being the work of divisions of the Sales Corporation.

■ The Commission found that there was a regular flow of commerce in motor vehicles from the factories of General Motors in Michigan to the retail purchasers in other states, carried out first by the five dissolved companies and subsequently by their successor, and that this movement was assisted by the acts of GMAC. It accordingly made an order directing General Motors Corporation, General Motors Sales Corporation and General Motors Acceptance Corporation to cease and desist from the form of advertising which they had pursued under the plan.[1] We think the order was right and should be affirmed and the petition to review be denied.

There was evidence before the Commission to support its finding that the advertisements referred to "Have the capacity and tendency to mislead and deceive, and have misled and deceived, a substantial part of the purchasing public into the erroneous and mistaken belief that the said '6%' or 'six per cent' finance plan, as above set forth, contemplates a simple interest charge of 6% per annum upon the deferred and unpaid balance of the purchase price of the motor vehicles sold * * *, and tends to cause, and has caused, such purchasing public to buy motor vehicles manufactured by General Motors because of that erroneous and mistaken belief, when in truth and in fact the total of the credit charge, computed in accordance with said '6%' or 'six per cent' plan, amounts to approximately 11½% simple interest per annum upon the deferred and unpaid balance, as diminished by the installment payments made, of the price of the motor vehicles sold to the purchasing public."

That the rate of interest is actually almost double 6% simple interest, as found by the Commission, is shown by Commission's Exhibit 66, which is a booklet issued by GMAC, and is not contested by General Motors or its subsidiaries. That the rate is so much greater than 6% is because the GMAC time payment plan of financing involves a 6% charge "on the full amount of the account originally financed from the date it begins to run to the date the account is closed, regardless of the fact that the account is divided into, and amortized gradually and regularly by, monthly payments of equal amounts."

While we do not regard the plan used here as inevitably misleading, we think that in a good many cases it would be likely to cause the purchaser of a car to believe that he was paying an interest rate of 6% per annum upon his deferred instalments and that under it he was afforded the convenience of financing through the agency that sold the car at as good rates as he could obtain by borrowing from his bank and paying for the car in full.

It is argued that the advertisement we have quoted could not mislead. The advertisement stated on its face: "It is not 6% interest, but simply a convenient multiplier anyone can use and understand." Never-

---

[1] (1) The order directed General Motors and its subsidiaries to cease and desist from : (1) Using the words "six per cent" or the figure and symbol "6%" or any other words, figures or symbols indicating percentage, in connection with the cost of, or the additional charge for, the use of a deferred or instalment payment plan of purchasing motor vehicles or any other product, when the amount of such cost or charge collected from, or to be paid by, the purchaser of a motor vehicle or any other product under such plan is in excess of simple interest at the rate of 6% per annum, or at the rate indicated by such words, figures or symbols, calculated on the basis of the unpaid balance due as diminished after crediting instalments as paid ;

(2) Acting concertedly or in cooperation with any company, firm or individual, or with any of their agents or dealers, in a way calculated to further the sale of motor vehicles or any other product through use of the methods referred to in paragraph (1) of this order.

theless the calculation of the difference between a rate of 6% per annum and the amount payable under the plan would not be easy for the ignorant, as was demonstrated by the inability of at least one witness to make the calculation. Nor would the distinction be observed by the careless. The words in the fourth line of the advertisement: "With a new 6% plan," arrest the attention immediately and many a purchaser would not continue to read the rest of the advertisement or digest the warning statement that the 6% was not interest, but merely a multiplier. Moreover, there was a body of advertising matter on billboards and on window posters in which no such guarded statement was made and in which the attention of the public was directed pointedly to the unexplained symbol "6%."

It is noteworthy that the plan involved such competitive advantages that rival companies doing a large proportion of the business of the country felt obliged to adopt and to advertise it with emphasis on the "6%" symbol. It is objected by the petitioners that the reason the plan appealed to the public and was adopted by competitors was only that the mode of calculating the instalment payments was very simple and that under the plan the finance cost of an instalment purchase was less than formerly. This really does not affect the issue of the propriety of the advertising. That, under the plan, GMAC was offering to finance instalment purchases at lower costs than before did not justify a form of advertising which has been found by the Commission, upon substantial evidence, to result in deception of the public. It may be that there was no intention to mislead and that only the careless or the incompetent could be misled. But if the Commission, having discretion to deal with these matters, thinks it best to insist upon a form of advertising clear enough so that, in the words of the prophet Isaiah, "wayfaring men, though fools, shall not err therein," it is not for the courts to revise their judgment.

As a practical matter we suggest that the order cannot be one grievously interfering with the only convenient mode of computing monthly instalment payments on unpaid balances, since several competitors with a great business abandoned advertising, similar to that we have been considering, when it was challenged by the Commission.

 The contention that the Commission was without jurisdiction because GMAC was not engaged in interstate commerce is without merit. While GMAC was primarily acting as a local finance company, it was wholly-owned by General Motors, and, with the Sales Corporation, acted as an agent of General Motors in a unified plan of selling and financing cars shipped in interstate commerce. Under the decision of the Supreme Court in Federal Trade Commission v. Education Society, 302 U.S. 112, 120, 58 S.Ct. 113, 82 L.Ed. 141, there was jurisdiction. Cf. National Harness Manufacturers' Ass'n v. Federal Trade Comm., 6 Cir., 268 F. 705, 709.

Petition denied and order of the Commission affirmed.