## FORD MOTOR CO. v. FEDERAL TRADE COMMISSION.

### No. 8510.

Circuit Court of Appeals, Sixth Circuit.
June 5, 1941.

Henry C. Bogle and Thomas J. Hughes, both of Detroit, Mich. (Bodman, Longley, Bogle, Middleton & Farley, of Detroit, Mich., on the brief), for petitioner.

Martin A. Morrison and James M. Hammond, both of Washington, D. C. (W. T. Kelley, Martin A. Morrison, James M. Hammond, and James W. Nichol, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

This is a petition by the Ford Motor Company to review an order of the Federal Trade Commission requiring it to cease and desist from the use of the word "six percent" or the figure and symbol "6%" in certain forms of advertising in connection with the cost of, or the additional charge for, the use of a deferred or installment payment plan of purchasing automobiles manufactured by it.

On December 1, 1936, the Federal Trade Commission issued a complaint against the petitioner and the Universal Credit Corporation, which was served on petitioner, charging it with the use of unfair methods of competition in commerce in violation of the provisions of the Federal Trade Commission Act, U.S.C.A. Title 15, Section 45, 38 Stat. 717, 719, 720.

After the filing of separate answers by the petitioner and the Universal Credit Company and before taking testimony in support of the complaint as to petitioner, the Commission, on May 9, 1937, approved a stipulation executed by the Universal Credit Corporation agreeing to cease and desist and on May 5, 1937, the Commission dismissed the complaint as to it. On January 10, 1938, petitioner filed a motion to dismiss the complaint, which motion was denied by the Commission.

Evidence was thereafter introduced by the Commission before a duly designated examiner who filed an intermediate report.

The proceedings thereafter came before the Commission for a final hearing upon the complaint, the answer of petitioner, testimony, briefs and oral argument and the Commission, after finding that the proceeding was in the interest of the public, found substantially as follows: that petitioner was a corporation organized and existing pursuant to the laws of the State of Delaware, with its principal office and place of business at Dearborn, Michigan, where it engages in the business of manufacturing all types of automobiles, including trucks, which are shipped from its place of business and from its assembly plants located at various points in the United States, to purchasers in the various states of the United States and in the District of Columbia. To assist in carrying out distribution of its products, petitioner maintains numerous assembly plants in various states other than Michigan, where parts manufactured in Michigan are shipped and assembled into completed automobiles and trucks and shipped to purchasers or prospective purchasers in zones covering various states within shipping radius of said assembly plants. Petitioner is one of the largest producers, manufacturers and distributors of automobiles in the United States with wide influence in the automobile manufacturing industry as a whole.

The Chrysler Corporation, Nash-Kelvinator, Graham-Paige Motors Corporation, the Hudson Motor Car Company, the Reo Motor Company, and the Packard Motor Company, all are also engaged in the manufacture of automobiles in competition with petitioner and in the sale and distribution thereof in commerce between and among

the various states of the United States and the District of Columbia, cars manufactured by them being shipped from their factories in Michigan and elsewhere to all parts of the United States for sale to the purchasing public. Petitioner maintains several thousand retail dealer outlets throughout the United States with whom it has contracts to sell its cars wholesale at prices fixed by petitioner, the dealers agreeing to maintain places of business of a definite kind and nature and to sell the cars in a manner specified by petitioner. The dealers purchase their cars from petitioner for cash, sight draft or through the Universal Credit Corporation, a Michigan corporation organized by petitioner in 1928, for the purpose of furnishing credit to its dealers and retail purchasers. In May, 1933, petitioner sold its entire stock in the Universal to the Commercial Investment Trust Company.

Petitioner's dealers agree to take retail orders for new cars on a specified order blank and operate their business generally in the manner outlined in their contracts with it. Petitioner sells its cars direct to dealers who take title to them and in turn the dealers sell to the public, but petitioner assists in the sales through wide and extensive advertising in newspapers, magazines, billboards and in other ways.

The business of the Universal Credit Corporation is confined entirely to financing the sale of petitioner's cars, accessories and parts sold to petitioner's dealers and to the financing of retail sales by dealers to the public, except where a used car of another make is traded in, when if requested, it will also finance the sale of such cars. Retail contracts are entered into between the buyer and the dealer, whereby the retail buyer makes a down payment either in cash or by trading in a used car or sometimes both, leaving an unpaid balance which the purchaser agrees to pay over a period of twelve, eighteen or twenty-four months. The Universal Credit Corporation, pursuant to its arrangement with petitioner, and, if the dealer desires, purchases the installment contract and collects the payments.

Petitioner, in some instances, makes sales of its cars direct to dealers on a cash and delivery basis, payment being made direct to petitioner at time of delivery but usually payments are through transactions such as bill of sale and trust receipt, conditional sales contract, lease or chattel mortgage, having varying methods in the different localities. Petitioner then transfers its interest and title to the cars thus sold on a credit basis to the Universal Credit Corporation, receives the cash and the dealer thereafter deals direct with Universal in making payment.

The so-called "six percent plan" of financing the retail sale of automobiles was first used in 1935 by the General Motors Corporation, through its wholly-owned subsidiary, the General Motors Acceptance Corporation and was as follows:

"General Motors Acceptance
Corporation
"Reduces Time Payment Costs
"On New Cars
"With a new 6% Plan
"Simple as A, B, C

"A—Take Your Unpaid Balance

"B—Add Cost of Insurance

"C—Multiply by 6%—12 Months' plan

"(One-half of one percent per month for periods more or less than 12 months)

"That's your whole financing cost. No extras. No service fees. No other charges.*

" * In some states a small legal documentary fee is required.

" GMAC announces today a new, economical way to buy any new General Motors car from General Motors dealers all over the United States.

"It's the plan you've been waiting for—a plan you can understand at a glance. It is far simpler and more economical than any other automobile time payment arrangement you've ever tried.

"Actually as simple as A, B, C—this new plan provides for convenient time payments of the unpaid balance on your car—including cost of insurance and a financing cost of 6%. This represents a considerable reduction in the cost of financing car purchases. It is not 6% interest, but simply a convenient multiplier anyone can use and understand. Nothing is added in the way of so-called service or carrying charges. There are no extras. Simply a straightforward, easy-to-understand transaction.

"This single step brings the world's finest cars within reach of thousands who have long needed new cars. When you buy a new Cadillac or Buick, Chevrolet or Pontiac, Oldsmobile or LaSalle, on this new plan, you actually save money!

"And finally—buyers under this new plan receive an insurance policy in the Gen-

eral Exchange Insurance Corporation which protects them against Fire, Theft and Accidental Damage to their cars.

"(Block here asking owners to make comparison with other finance plan.)

"Offered Only by Dealers in Chevrolet Cars & Trucks—Pontiac Oldsmobile—Buick—LaSalle Cadillac"

General Motors, through its subsidiaries, published many thousands of advertisements featuring this so-called "6% plan," some with the above explanation, others merely referring to a "6%" plan without explanation.

Other leading automobile manufacturing concerns promptly announced similar plans, all featuring the "6%" plan, determined approximately in the same manner as the General Motors, the first to do so being Chrysler, followed by Nash Motors, Reo, Hudson, Graham-Paige, Packard and the petitioner, all appearing in advertisements in newspapers of general and wide circulation and all featuring in a conspicuous manner, the symbol "6%" or the words "six percent," and all determined in the same manner as the plan of petitioner.

Many independent finance companies engaged primarily in financing retail sales of automobiles were obliged to abandon their pre-existing methods of computing charges in order to meet competitive disadvantages to which they were put by the publication and operation of the so-called "6%" plans of petitioner and others. Before that, the charges of all automobile finance companies were slightly higher than the rates under the so-called "6%" plan and were based on a flat charge for a specified credit over a definite period.

In January 1936, petitioner announced it had adopted the "6%" plan and issued throughout the country the advertisement found in the margin.[1]

Petitioner published many similar advertisements, some with the explanatory data in the advertisement quoted in the margin, others merely referring to the plan as follows:

"Ask your Ford dealers about the new $25-a-month new U. C. C. 6% finance plan."

"6% Plan of Financing. Total cost of credit is only ½ % monthly on original unpaid balance and insurance.

"(6% for 12 months)"

Petitioner published similar advertisements which it paid for out of a fund collected and controlled by it called the "Local or Dealers Fund," created by the collection from the dealers of a fixed charge for advertising on all cars sold by them, and charged on the invoice to the dealer and in turn passed on to the public by him. The "6%" plan of advertising was discontinued by petitioner about July 1936.

At the same time petitioner published the above outlined advertisements, the Universal Credit Corporation, acting concertedly with petitioner, published similar advertisements at its own expense, all of which were for the purpose of promoting the sale of petitioner's cars.

The respondent issued complaints against all the other larger automobile manufacturing companies at about the same time it issued the present complaint against petitioner, all of which were disposed of by a stipulation by each that it would cease

---

[1] "Ford
Announces $25-A-Month
Time Payments
and a
New UCC 6% Finance Plan
"Any New Ford V-8 Car
Can Now be Purchased for $25 a Month
with Usual Low Down-Payment

"This $25-a-month time payment plan enables you to buy a New Ford V-8 car through your Ford dealer on new low monthly terms.

"After the usual low down-payment is made, $25 a month is all you have to pay for any type of new car, including insurance and financing.

"Your cost for this extension of credit is only one-half of 1 percent a month on your original unpaid balance and insurance. This plan reduces financing charges for twelve months to 6 percent. For example, if you owe a balance of $400 for your car and insurance, you pay $24 for the year of credit; if the balance is $200 you pay $12. Your credit cost for one year is the original unpaid balance multiplied by 6 per cent.

"UCC plans provide you with insurance protection at regular conference rates. You have not only fire and theft insurance, but $50 deductible collision, and protection against other accidental physical damage to your car.

"The Universal Credit Company has made these plans available through Ford dealers in the United States.
"Ford Motor Company"

and desist from the practices complained of by the Commission with the exception of the petitioner and the General Motors Corporation. The stipulations in each case were similar and provided in part:

"Certain purchasers and prospective purchasers did interpret and understand that the advertising of said finance plan or method as above set forth did contemplate a simple interest charge at 6% per annum upon the deferred and unpaid balance of the purchase price of motor vehicles, and this did cause such members of the purchasing public to buy motor vehicles in that belief."

All of the companies executing these agreements to cease and desist carried them into effect and the respondent found that in the event petitioner resumed the advertisement of a "6%" plan, the companies which had agreed to cease and desist from the plan would be at a competitive disadvantage in the industry.

The "6%" plan was computed in actual practice as follows:

On a new car, the purchase price of which is $643 and on which the purchaser makes a down payment of $243, there is an unpaid balance of $400 due and if the dealer furnishes the insurance, its cost on the above transaction would be $15, the total balance to be paid by the purchaser would be $415 and where this amount is paid according to the 6% plan (or ½ of 1% a month) in eighteen consecutive monthly payments of substantially $25 each, the charge of ½ of 1% a month for 18 months, or 9% on $415 would be $37.35, which, added to the original balance of $415, makes a total sum of $452.35.

This same transaction with an unpaid balance of $415 paid in a like manner at $25 a month over a period of eighteen months on a straight 6% simple interest per annum basis, computed on the declining balances as reduced by monthly installments, would amount to $19.34 interest charge or $18.01 less than the charge made pursuant to petitioner's plan. Comparative tables prepared by an expert account-

ant in evidence in the case indicated that the credit charge under petitioner's "6%" plan amounted to approximately 11½% simple annual interest.

The 6% plans of all of petitioner's competitors were also computed in the above described manner and the average member of the public was under the impression the "6%" plan as advertised by petitioner and the other manufacturers meant 6% simple interest annually on the remaining balance after deducting each successive monthly payment.

The cars manufactured by petitioner at Dearborn, Michigan, and sold through retail dealers to the retail purchasers thereof throughout the United States and in the District of Columbia are in the regular flow of interstate commerce. The Commission found that the statements contained in petitioner's advertising matter with reference to its "6%" plan had the tendency to mislead and deceive, and did mislead and deceive, a substantial part of the purchasing public into the erroneous belief that petitioner's finance plan or method as outlined contemplates a simple 6% interest charge upon the deferred and unpaid balance of the purchase price of cars and tended to cause, and has caused, the public to purchase automobiles from the petitioner through its dealers and agents because of this mistaken belief, when the actual credit charge, computed in accordance with the "6%" plan, amounts to approximately 11½% simple annual interest on the unpaid balance of the installments due on cars sold. It also found that these acts and practices of petitioner tended to unfairly divert trade to the petitioner and its dealers from competitors who correctly represented the cost of the credit charges for purchasing cars on the installment or deferred payment plan and a substantial injury had been done by petitioner to competitors in commerce among and between the various states of the United States and the District of Columbia.

The order to cease and desist of the Commission is found in the margin.[2]

[2] "This proceeding having been heard by the Federal Trade Commission upon the complaint of the Commission, the stipulation as to the facts, agreement to cease and desist and dismissal heretofore entered herein as to the respondent, Universal Credit Corporation, the answer of respondent, Ford Motor Company, the testimony and other evidence taken be-

fore Edward E. Reardon, an examiner of the Commission, theretofore duly designated by it, in support of the allegations of said complaint, briefs filed herein and oral arguments by James M. Hammond, counsel for the Commission, and by Henry C. Bogle, counsel for the respondent, Ford Motor Company, and the Commission having made its findings as to the

Petitioner seeks to avoid the questioned order on the following grounds:

(1) That the method used by it in the sale of its automobiles was not unfair;

(2) That the proceedings by the Commission to prevent the use of the method by the petitioner is not in the public interest;

(3) That the method of the petitioner does not affect competition in interstate commerce;

(4) That the desist order goes further than is reasonably necessary to correct the alleged evil and to protect the rights of competitors and the public.

The relevant portion of Section 5 of the Federal Trade Commission Act as it read at the time the present complaint was issued, Act of September 26, 1914, c. 311, 38 Stat. 717, 719, 720, 15 U.S.C.A. § 45, is as follows: "That unfair methods of competition in [interstate and foreign] commerce are hereby declared unlawful."

■ The phrase is not statutorily defined and its scope cannot be precisely determined and what constitutes "unfair methods of competition" must be decided in particular instances upon incidences in light of existing competitive conditions. Schechter Poultry Corp. v. United States, 295 U.S. 495, 532, 533, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. The courts, and not the Commission, must ultimately determine, as a matter of law what this phrase includes. Federal Trade Commission v. Beech-Nut Packing Company, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L. R. 882.

■ Unfair methods of competition as used in the Act may consist generally of false advertising of a product, process or method which misleads, or has the capacity or tendency to mislead, the purchasing public into buying such product, process or method in the belief it is acquiring one essentially different. Federal Trade Commission v. Winsted Hosiery Company, 258 U.S. 483, 492, 493, 42 S.Ct. 384, 66 L.Ed. 729; Procter & Gamble Company, et al. v. Federal Trade Commission, 6 Cir., 11 F.2d 47. The question does not depend upon the purpose of the advertisement nor upon the good or bad faith of the advertiser. The point for consideration here is whether, under the facts and circumstances in connection with the publication of the advertisement, the language in and of itself, without regard to good or bad faith, is calculated to deceive the buying public into believing it is purchasing petitioner's cars at one price when in fact it is purchasing them at another. A prerequisite to the application of the statute in any case is the unfair interference with interstate trade and such deception of the public as to cause it to buy and pay for something which it is in fact not getting.

Petitioner contends that the method of competition here complained of is not unfair within the meaning of the Act nor of the foregoing general rule, as it long has been the established practice of automobile manufacturers and vendors of merchandise on the deferred payment plan to charge an advance over what would be charged in a cash sale and that it also has been the common practice of banks and small loan

facts and its conclusion that said respondent, Ford Motor Company, has violated the provisions of the Federal Trade Commission Act;

"It is ordered that the respondent, Ford Motor Company, its officers, representatives, agents and employees, in connection with the offering for sale, sale and distribution of motor vehicles in interstate commerce or in the District of Columbia, do forthwith cease and desist from:

"(1) Using the word 'six percent' or the figure and symbol '6%', or any other words, figures or symbols indicating percentage, in connection with the cost of, or the additional charge for, the use of a deferred or installment payment plan of purchasing motor vehicles, when the amount of such cost or charge collected from, or to be paid by, the purchaser of a motor vehicle under such plan is in

excess of simple interest at the rate of 6% per annum, or at the rate indicated by such words, figures or symbols, calculated on the basis of the unpaid balance due as diminished after crediting installments as paid;

"(2) Acting concertedly or in cooperation with any company, firm or individual, or with any of its agents or dealers, in a way calculated to further the sale of motor vehicles through use of the methods referred to in paragraph (1) of this order.

"It is further ordered that the respondent Ford Motor Co., shall, within sixty (60) days after service upon it of this order, file with the Commission a report in writing, setting forth in detail the manner and form in which it has complied with this order.

"By the Commission."

182

companies to advertise loans with a percentage added to the principal payable over fixed periods without calculating interest upon a declining balance. It also charges that the Federal Housing Administration and the Federal Electric Home and Farm Authority, two governmental agencies, use the same plan. It thus argues that the present advertisements were subject to the interpretation only that petitioner was adding a charge to the cash price of its cars because of the extension of credit to the purchaser.

The practices in the automobile industry or those in similar related enterprises are immaterial, if petitioner's advertisements misled the members of the public into purchasing its cars at a higher cost than they otherwise would have paid.

A method inherently unfair does not cease to be so because the falsity of the public representation has become so well known to those engaged in identical or similar enterprises as to no longer deceive them. Federal Trade Commission v. Winsted Hosiery Company, 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729.

The average individual does not make, and often is incapable of making, minute calculations to determine the cost of property purchased on the deferred payment plan. Mechanization, industrialization, and urbanization have transformed the structure of our society and raised to the proportions of a major social problem, the protection of the installment purchaser against his own ignorance and the pressure of his need.

The present advertisement must be considered from the view of the prospective purchasers of petitioner's cars and, in determining its capacity or tendency to mislead, must be judged from its general fabric, not its single threads.

Kindred senses in the use of language may be so interwoven that the perplexities cannot be disentangled nor any reason be assigned why one should be ranged before the other. The advertisement here in question is susceptible to the construction that it contains two ideas; one, that it means simply an addition of six percent to the cash price of the car, charged for an extension of credit and the other, that it means ordinary interest at the rate of 6% on deferred installment payments. Either idea is so obscure that one blends into the other. The uncertainty of

terms and commixture of ideas expressed by petitioner in its advertisement had the tendency to mislead. General Motors Corp., et al. v. Federal Trade Commission, 2 Cir., 114 F.2d 33.

Petitioner's contention that the present proceedings were not in the interest of the public must be rejected. The Federal Trade Commission Act was intended to afford a preventative remedy, not a compensatory one, so that the suggestion no damage has been shown by the offense complained of to a purchaser of petitioner's cars or a competitor is no defense to the proceeding. National Harness Manufacturers Association v. Federal Trade Commission, 6 Cir., 268 F. 705.

The primary consideration in carrying out the purpose of the present Act is the promotion and continuance of free enterprise and competition in interstate commerce. Installment credit in varying forms is widely used in this country in the purchase of many types of property and especially affects the manufacturers of automobiles. No one can deny it is in the public interest in the sale on credit of such devices to prevent the use of methods which have a tendency and capacity to mislead the purchasing public and to unfairly damage the manufacturer's present or potential competitors and that such practices may be restrained. In determining whether a proceeding is in the public interest, the Commission exercises a broad discretion (Federal Trade Commission v. Klesner, 280 U.S. 19, 28, 50 S.Ct. 1, 74 L. Ed. 138, 68 A.L.R. 838) and each case must be determined upon its own facts. Federal Trade Commission v. Beech-Nut Company, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882. When misleading advertisements attract customers by means of deception perpetrated by the advertiser, it is presumed that business is thereby unfairly diverted from a competitor, who truthfully advertises his process, method or goods. Federal Trade Commission v. Winsted Hosiery Company, supra.

The advertisement in the case before us was in a concededly highly competitive field of business and its context was susceptible of attracting to petitioner the business of those who wished to finance the installment sales of automobiles at a simple 6% rate of interest. We conclude that under the circumstances of the instant case, the proceedings were in the interest of the public.

Petitioner urges on us that neither the 6% plan itself, nor its advertisement, affected the sale of automobiles by the petitioner to its dealers, nor their transportation in interstate commerce, that petitioner sells only to its dealers and that by the time its cars reach them, wherever located, petitioner has received its payment therefor and has no further interest therein. It urges that the 6% plan and its advertising relate solely to the financing of payments on time sales of cars sold by its dealers to their customers and are matters with which it is not concerned, also that sales by its dealers to its customers are purely intrastate transactions.

Advertising goes hand in hand with volume of production and retail distribution. It operates to increase the demand for and availability of goods and to develop quickly consumers' acceptance of the manufactured products. Expressed another way, it breaks down consumers' resistance, creates consumers' acceptance and develops consumers' demand.

 The Federal Trade Commission Act was enacted under the power of Congress to regulate interstate and foreign commerce and by its express terms (Section 4, 15 U.S.C.A. § 44) deals only with such commerce. Interstate commerce includes intercourse for the purpose of trade which results in the passage of property, persons or messages from within one state to within another state. All of those things which stimulate or decrease the flow of commerce, although not directly in its stream, are essential adjuncts thereto and the Congress has power to confer on the Federal Trade Commission their regulation. Stafford v. Wallace, 258 U.S. 495, 516, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

The use of advertising as an aid to the production and distribution of goods has been recognized so long as to require only passing notice. The economy of mass production is just as well known and the effects of advertising may be described as mass selling without which distribution would be lessened and a fortiori production correspondingly decreased. The present advertisement of the method for financing the purchase of petitioner's cars on credit was an integral part of their production and distribution.

The sale on credit of petitioner's cars by its local dealers, when separately considered, may be intrastate in character but when the activities of petitioner's local agencies are weighed in the light of their relationship to the petitioner, and its financing sales of cars, it is at once apparent that there is such a close and substantial relationship to interstate commerce that the control of such activities is appropriate to its protection.

Petitioner urges that the case of Federal Trade Commission v. Bunte Bros., Inc., 61 S.Ct. 580, 85 L.Ed. —— (decided Feb. 17, 1941), is decisive here. In that case the alleged unfair method of competition was admittedly confined to activities wholly within the State of Illinois, and the Commission claimed jurisdiction on the ground that it had the duty to regulate intrastate activities in order to protect interstate commerce. The court held that no such power was implied in the Act and declined to enforce the Commission's order. The cited case is without point.

Cease and desist orders of the Commission should go no further than reasonably necessary to correct the evil complained of and preserve the rights of competitors and the public and we are of the opinion that the order here did not violate this rule, but was necessary to protect the public against the species of deception alleged in the complaint. General Motors Corporation v. Federal Trade Commission, supra. The Commission's findings are supported by substantial evidence. Petition denied and order of Commission affirmed.