KORBER HATS, INC., et al., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 6003.

United States Court of Appeals First Circuit.

Heard Nov. 7, 1962.

Decided Dec. 31, 1962.

Ira M. Millstein, New York City, with whom Marshall C. Berger and Weil, Gotshal & Manges, New York City, were on brief, for petitioners.

Thomas F. Howder, Atty., Federal Trade Commission, with whom James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition for review of a cease and desist order of the Federal Trade Commission which found that certain labelling practices of petitioners constituted a violation of Section 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. § 45(a) (1)).

Petitioner, Korber Hats, Inc.,[1] is a Massachusetts corporation which maintains its principal place of business in Fall River and manufactures and distributes men's hats. As part of its line of summer offerings, petitioners manufacture—in their Fall River plant —a hat made out of Philippine hemp braid which it imports from Japan and markets them in commerce under labels variously styled as follows: "Genuine Milan," "Genuine Imported Milan," "Genuine Milan, Imported Handblocked." These words appear variously on the "tag" or label in the crown and in some instances were imprinted on the sweatbands.

The Commission found such labeling to be false, misleading and deceptive and ordered petitioners to cease and desist from:

"(1) Using the terms 'Milan', 'Genuine Milan', 'Imported Milan', 'Genuine Imported Milan' or any other substantially similar representation as descriptive of men's straw hats not manufactured in Italy of wheat straw.

"(2) Using the terms 'Milan', 'Genuine Milan', 'Imported Milan',

---

1. The other petitioner is Sidney Korber, president of Korber Hats, Inc., and its sole stockholder.

360

'Genuine Imported Milan' or any other substantially similar representation as descriptive of men's straw hats not of the same construction, design and workmanship as that traditionally characteristic of men's straw hats manufactured in Italy and designated as 'Milan'.

"(3) Using any words or phrases which directly or indirectly, represent that said products are manufactured in a given country or out of certain materials or in a particular manner or style unless such is a fact.

"(4) Furnishing or otherwise placing in the hands of retailers or dealers in said products the means and instrumentalities by and through which they may mislead or deceive the public in the manner or as to the things hereinabove inhibited."

The principal issues raised here relate to the substantiality of the evidence to support the Commission's findings of fact as to the falsity or deceptiveness of the labels and, secondly, to the scope of the order.

The record establishes that the term "Milan" is one of long standing in the field of men's straw hats. It appears that in former days the area around the Po River Valley in Italy was a fertile source of wheat straw. The inhabitants of this region would harvest this material and the straw would then be woven into an artistic and distinctive type of braid and ultimately sewn into hat "bodies" in the cities of northern Italy. The bodies would then be exported from Italy to various countries including the United States. Inasmuch as the vast majority of these shipments were made from Milan these hats came to be known as "Milan" hats.

The evidence discloses that in the ensuing years wheat straw was also grown on the Chinese mainland and this too was woven into a braid which was used in men's straw hats. For many years this braid was imported directly into the United States and thereafter utilized to manufacture straw hats under a "Milan" label.

In recent years international events forced a cessation in the import of such raw material from Communist China. Now wheat straw from China is sent to Italy where it is sewn into hat "bodies" which are exported to the United States.

The evidence shows that hats made of wheat straw and sold as "Milan" are "quality" or "luxury" items and range in retail price from $11.95 to $20.00. The hat is extremely light in weight, has a desirable "feel," and superior shape-retention qualities. It has a "sharp" and "firm" bead to the braid and is more "lustrous" because of the superior dyes with which it is prepared.

On the other hand, hats made of Philippine hemp normally range in price from $3.95 to $7.95. There is evidence that the hats are slightly heavier than those made of wheat straw, have inferior shape-retention features and, as opposed to the smooth variegated texture of the wheat straw product, have a woody "feel" or texture.

The foregoing distinctions between wheat straw hats and hemp hats were made by men of broad experience in the hat industry. Despite these distinctions, there was ample testimony that the two types of hats possessed such a surface similarity that the average customer—uninitiated in the lore of the hat industry—might fail to perceive a difference in the two products.

Section 5 of the Act makes unlawful unfair methods of competition and unfair or deceptive acts or practices in commerce. Congress thus gave the Commission a broad mandate to prevent public deception in the give and take of the market place. It is clear that what is an "unfair" method of competition can only be assayed in the environmental and marketing context of the particular practice put in issue. In Schechter Poultry Corp. v. United States, 295 U.S. 495, 532, 533, 55 S.Ct. 837, 844, 79 L.Ed. 1570 (1935), the Court said: "What are 'unfair meth-

ods of competition' are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest."

The power of the Commission to issue cease and desist orders against mis-labelling or false advertising was recognized at an early date. Federal Trade Comm. v. Winsted Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729 (1922). Courts have consistently upheld the Commission's efforts to compel manufacturers and retailers to adhere to a high level of honesty in connection with their labelling and advertising habits, see Kalwajtys v. Federal Trade Commission, 237 F.2d 654, 656, 65 A.L.R.2d 220 (7th Cir., 1956), cert. denied, 352 U.S. 1025, 77 S. Ct. 591, 1 L.Ed.2d 597 (1957), and to "insist upon the most literal truthfulness" in marketing their goods. Moretrench Corporation v. Federal Trade Commission, 127 F.2d 792, 795 (2nd Cir., 1942). In this area not only the cynical but the naive are to be protected and if the Commission, in its discretion, "thinks it best to insist upon a form of advertising clear enough so that, in the words of the prophet Isaiah, 'wayfaring men, though fools, shall not err therein,' it is not for the courts to revise their judgment." General Motors Corp. v. Federal Trade Commission, 114 F.2d 33, 36 (2nd Cir., 1940).

While advertising and labelling are frequently considered together, there is good reason to insist upon a higher degree of veracity in the latter. It may well be argued that consumers accept labelling statements literally while perhaps viewing with a more jaundiced eye the vaunted claims of the advertising media.

The question here is whether there is substantial evidence to support the Commission's findings that a consumed in buying petitioners' hemp hats, bearing the label "Milan," "Genuine Milan," or "Genuine Imported Milan," might be mislead. In the final analysis,

the validity of a label should undoubtedly be judged by the predictable inference a prospective customer will draw from it. What inferences are likely to be drawn from petitioners' labels?

Reginald Borgia, a fifteen year employee of the Hat Corporation of America and manager of its Dobbs Hat Sales Division in New York, testified that to him the term "Milan" had always meant a hat made of wheat straw. He stated that if he saw the word "Milan" appearing alone on either a sweatband or in some other part of a hat, this would indicate to him that the hat was "a genuine Milan straw, a wheat straw." He testified that this was not only his own interpretation but was an industry-wide understanding. Thus, he stated that: "if I refer to somebody that this is a Milan hat, they would say the same thing. It is made out of wheat straw. When I am dealing with buyers from various concerns and I mention the word 'Milan,' they automatically consider it that type, wheat straw Milan." Finally he testified that in his view the average customer would be unable to tell the difference between the hemp hat and the "Milan" hat.

Gerald Rolnick, vice-president of the Byer-Rolnick Hat Corporation, testified that if he saw the legend "Genuine Milan" or "Imported Genuine Milan" imprinted on a sweatband or the crown of a hat that it would mean to him that it was a wheat straw hat. He also testified that, in his opinion, the average customer coming to a store to buy a hat would not be able to tell the difference between a hat made out of wheat straw and one made out of hemp.

Ellis A. Campus, office manager of the Ecuadorian Panama Hat Company, who had some forty years experience in the men's straw hat industry, testified that if he saw the word "Milan" affixed to a hat that he would think that it was made from wheat straw. It was his view that the average customer "would think he was buying a Milan hat" if a "Milan" label was appended to a hemp hat. Thus, he stated: "I think that when a man

goes into a store and picks out a hat with any particular name, it is one thing. When he goes into a store and wants to buy a Panama hat or a Milan hat, he expects the hat to be what they are marked, Milan or Panama * * * [and] * * if you went in and bought a hemp hat marked Milan, you would be going against the usage of the name."

William R. Manning, manager of the straw hat division of the John B. Stetson Company, reiterated the view that use of the term "Milan" standing alone on a hat would connote to him that the hat was made of "either Italian Milan or China braid Milan straw in Italy, sewn in Italy." He also testified that in his opinion the average customer who saw a hat labelled "Milan" would expect to get a "Milan" hat.

In addition to the testimony of these four representatives of the hat industry and Commission witnesses, the record also contains the testimony of Morris Mantell, a United States Custom Examiner of some fifteen years experience. Mantell testified that "when I see the word 'Milan' it implies to me that it is a straw hat, a wheat straw hat." He noted that different import rates applied to wheat straw and hemp.

In our view the foregoing testimony must be regarded as "substantial evidence" supporting the Commission's findings that use on a hemp hat of the term "Milan"—either standing alone or buttressed by such further expressions of authenticity as "Genuine Milan" or "Genuine Imported Milan"—might well tend to mislead the consumer into believing that he was obtaining a hat made of wheat straw. We note in passing that the evidence reviewed above is that most favorable to the Commission. Much of the evidence throughout the record is confusing and contradictory and there is evidence which supports the petitioners' view that the use of the subject labels would not be misleading. However, once we determine that there is substantial evidence supporting the Commission's findings we must affirm. "The fact that there is a real conflict in the testimony

with indeed substantial evidence by the petitioner contrary to the finding, does not change the situation, as this court cannot appraise testimony or pick and choose 'for itself among uncertain and conflicting inferences therefrom.'" [citing Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655] Jacob Siegel Co. v. Federal Trade Commission, 150 F.2d 751, 755 (3 Cir., 1944), rev'd on other grounds, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946).

For the foregoing reasons, we believe that the Commission's order should be affirmed to the extent that it restricts use of the term "Milan"—either standing alone or in conjunction with amplifications indicating authenticity or genuineness, e. g., "Genuine Milan," "Genuine Imported Milan,"—to those hats which are manufactured out of wheat straw.

However, we have some difficulty with the scope of the Commission's order. As noted, we are satisfied that the primary market significance of the term "Milan" is that of a wheat straw hat and that while "Milan" originally denoted the source or origin of a particular hat, the term now refers to its physical qualities or characteristics, viz., a straw hat made out of wheat straw. And, this quite apart from the fact that the wheat straw comes from China or Italy.

However, petitioners argue that the term "Milan" apart from its primary marketplace significance of a "wheat straw" has, in effect, acquired a secondary meaning in that the term is now generally indicative of a type of weave or a type of braid. They argue that the weave of its hemp hat fits within this generic category and that it should be allowed to use the term "Milan" to the extent that it can be qualified or modified to exclude the possibility that a consumer would be likely to believe that he was getting a genuine wheat straw. In short, petitioners urge that the Commission erred in ordering the blanket prohibition of any reference to "Milan" in conjunction with hemp hats without considering the possibility of qualifying or modifying

language which would equally serve the public good.

■ We are fully aware that petitioners carry a heavy burden when they attempt to establish the currency of a dual meaning for a term having attained a specific primary meaning in the market place. Federal Trade Commission v. Algoma Lumber Co., supra; C. Howard Hunt Pen Co. v. Federal Trade Commission, 197 F.2d 273 (3rd Cir., 1952). However, we believe that in the instant case the petitioners have made a strong showing. In reviewing the evidence on this point, it may be noted that petitioners' witnesses all supported the contention that the "Milan" name was now indicative of a class of hats characterized by a distinctive weave or braid which included the hemp variety. The following review will, therefore, focus on the evidence given by the Commission's witnesses.

Each of the Commission's witnesses testified that the "Milan" term was now indicative of a class of hats characterized by a distinctive weave or braid which included the hemp variety. Borgia admitted that "Milan" now referred to a "definite type" of braid and that petitioners' hat fell within this type. He stated that his company—the Hat Corporation of America—manufactured hemp hats and these were referred to as "Hemp Milan." Moreover, the record shows that the Hat Corporation of America is actually marketing hemp hats under the label "Milan Imported."

Rolnick testified that it was his understanding that Milan referred to a "type of weave or braid" and that hemp hats manufactured by his company were referred to as "Kyoto Milans" to distinguish them from the Milan of Italian origin. He stated that while it was not customary for his company to label the hemp hats, the "Kyoto Milan" label would be affixed to the hat upon a customer's request.

Campus stated that if a hat was labelled as "Milan-type hemp," it would not indicate to him that it came from Italy but simply that it was a hemp braid— "A type as made in Italy, but hemp."

Finally, Manning testified to the generic meaning now ascribed to the Milan label in the hat industry. He stated that he was very familiar with the concept of Japanese Milan hemp and that the term was used to indicate a type of braid —similar in construction to that which was originally made of wheat straw.

In short, as we read the record, the evidence strongly indicates that the term "Milan" may now have acquired a secondary meaning in the hat industry denoting a type or class of hats embracing the hemp variety of petitioners. If it could be demonstrated that a label bearing the legend "hemp—Milan" or "Imitation Milan," or some similar qualification, would be unlikely to deceive a consumer as to the true characteristics of the hat which he was purchasing, then we believe that petitioners should be allowed to market their hats under such a label.

However, there is nothing to indicate that the Commission considered whether labels which qualified or modified the term "Milan" would be likely to deceive a prospective hat customer. The hearing examiner wrote a perfunctory opinion and the Board adopted his decision without amplification. Accordingly, we believe that the case should be returned to the Commission for a determination of whether an absolute proscription against the use of any variation of the term "Milan" is required to protect the public interest and insure against consumer deception. See Jacob Siegel Co. v. Federal Trade Commission, supra.

Finally, a word concerning paragraph (3) of the Commission's order may be warranted. Paragraph 3 orders petitioners to refrain from "Using any words or phrases which, directly or indirectly, represent that said products are manufactured in a given country or out of certain materials or in a particular manner or style unless such is a fact."

It would be difficult to imagine language broader in sweep or scope and, indeed, perhaps in vagueness and general-

ity. We are aware that the Commission's orders traditionally have been accorded great deference on review and are upheld where the court finds a "reasonable relation" between the violations proved and the activities prohibited. See Jacob Siegel Co. v. Federal Trade Commission, supra; Gellman v. F. T. C., 290 F.2d 666 (8th Cir., 1961). However, the Supreme Court has recently indicated that broad orders of the Commission should be subjected to more critical review on appeal and suggested the need for more specificity in cease and desist orders in view of the recently amended provision contained in Section 11 of the Clayton Act. 73 Stat. 243 (1959), 15 U.S.C. § 21 (Supp. III, 1961), amending 38 Stat. 734 (1914).

In Federal Trade Comm'n v. Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed. 2d 353 (1962), after alluding to the more stringent and immediate penalties for violation of cease and desist orders, the Court stated: "the severity of possible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application." Id., at 367–368, 82 S.Ct. 436.

The necessity for clearer, more definite and specific orders by the Commission has been recognized by a series of recent cases in the Second Circuit. American News Co. v. F. T. C., 300 F.2d 104 (2nd Cir., 1962); Grand Union Co. v. F. T. C., 300 F.2d 92 (2nd Cir., 1962); Swanee Paper Corporation v. F. T. C., 291 F.2d 833 (2nd Cir., 1961). We have recently indicated our reservations about broad orders of the Commission where the Commission has proven only a single violation. Colgate-Palmolive Company v. Federal Trade Commission and Ted Bates & Company, Inc., v. Federal Trade Commission, 310 F.2d 89, 1962.

Here the alleged violation involved a single product of the petitioners. There was no showing of past violations by them. National Labor Relations Board v. Cheney Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739 (1946); N. L. R. B. v. International Hod Carriers, Etc., 285 F.2d 397 (8th Cir., 1960); N. L. R. B. v. Brewery & Beer Distributor Drivers, Etc., 281 F.2d 319 (3rd Cir., 1960); see Communication Workers of America v. N. L. R. B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960) (per curiam); McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949), or any lack of good faith on the petitioners part, National Labor Relations Board v. Crompton Mills, 337 U.S. 217, 226, 69 S.Ct. 960, 93 L.Ed. 1320 (1949), in view of the previously cited understanding in the hat industry. Cf., Grand Union Co. v. F. T. C., supra.

For all of these reasons we believe that the language of paragraph 3 of the order may be entirely too broad. However, since we are returning the case to the Commission for further findings we need not pass upon this question at this point.

Decree will be entered setting aside the order of the Commission. Further proceedings to be in accordance with this opinion.