HANNEGAN, Postmaster General, v. READ MAGAZINE, Inc., et al.

No. 9268.

United States Court of Appeals District of Columbia.

Argued Oct. 17, 1946.

Decided Dec. 9, 1946.

EDGERTON, Associate Justice, dissenting.

———◆———

Mr. J. Francis Hayden, of Washington, D. C., Special Assistant to the Attorney General with whom Mr. Edward M. Curran, United States Attorney at the time the brief was filed, and Mr. Sidney S. Sachs, Assistant United States Attorney, both of Washington, D. C., were on the brief, for appellant.

Mr. John W. Burke, Jr., of New York City, of the Bar of the State of New York, pro hac vice, by special leave of Court, with whom Mr. Burdette M. Asbill, of Washington, D. C., was on the brief, for appellees.

Before EDGERTON, WILBUR K. MILLER, and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Appellant, as Postmaster General, issued an order forbidding the use of the mails to appellees. They brought a civil action in the District Court to enjoin enforcement of the order. That court granted their motion for summary judgment and granted a permanent injunction. This appeal followed.

Appellees publish two magazines and also publish books in the form of reprints of classical literature. In one of these magazines, they conducted a contest, called a puzzle contest, for large cash prizes. A group of eighty puzzles, divided into twenty series of four each, was initially offered for solution. The contest was promoted by national newspaper advertising, by extensive advertising in appellees' Facts Magazine, and by a booklet sent in response to coupons clipped from the advertisements. The "Official Rules of the Contest" were printed in full text.in the newspaper and magazine advertisements and in the booklet. They contained the following: "In case of ties, if two or more persons tie in submitting the correct solutions, then the first two or more prizes will be reserved for those contestants and will be awarded in the order of accuracy of the submissions of those contestants to a first, and if necessary, a second tie-breaking group of puzzles, divided into Series exactly like the first Group. In case a second tie-breaking Group of puzzles is necessary, contestants eligible to solve same will be required to accompany their solutions to this second tie-breaking Group of puzzles with a letter of not more than 200 words on the subject: 'The Puzzle I Found Most Interesting and Educational in This Contest.' All tie-breaking Series must be qualified in accordance with the provisions of Rule No. 8. Only in case ties exist after such final tie-breaking puzzles have been checked will the letters be considered, and in that event they will be judged on the basis of originality in description and general interest. In case of final ties, duplicate prizes will be awarded. Upon entering the contest, the entrant is asked to realize that the sponsor anticipates that a large number of persons may enter.the contest and that a large number may solve one, two or all three of the Groups of puzzles, and that the sponsors will not make known the number of persons competing in any phase of the contest, irrespective of how large or how small that number may be. FACTS Magazine reserves the right to offer contestants the opportunity to win increased prizes, or to offer consolation prizes or additional prizes at any time prior to the conclusion of the contest."

These Official Rules were printed in the same type and with equal prominence with the remainder of the text of the advertisements, except for the headlines. They were likewise printed in full in the booklet of puzzles sent to each entrant. Con-

testants were told, both in the advertisements and in the booklet, to read the Rules—"The Rules are printed in full below. Please read them carefully and be sure you understand them." The Rules were repeatedly referred to in the advertisements and in the booklet. The entry blank itself recited that the entrant wished to qualify "in accordance with the official rules." The headlines at the top of the advertisements, in large headline type, were "$10,000 First Prize—Puzzle Contest" and variations of the same terminology. The headlines and the text emphasized the puzzle feature of the contest. The contestants were told that they must enclose 15 cents with each series of four solutions, and that in return for the remittances for the twenty series, each contestant would receive a book issued by the appellee book company. Such books were duly sent each contestant as promised.

Contestants who solved the first group of eighty puzzles were sent a letter in which they were told that by buying additional books they could make themselves eligible for increased prizes. The letters were quite emphatic in stating that eligibility for the original prizes remained whether or not the contestants wished to qualify for eligibility for the increased prizes.

At the time of the hearing in the Post Office Department, $760,000 in fees had been received, and appellees had expended, or become obligated to expend, $935,000, including prizes, books distributed, printing, advertising, etc. The completion of the contest was interrupted by the Post Office action.

Appellant says that appellees knew at the outset that the winners of the contest would be finally determined not upon the accuracy of puzzle solutions, but upon a judging of the letters submitted by the tieing contestants. He also puts much stress upon the communications sent to all contestants who successfully solved the first series of puzzles. He says that the scheme was cleverly designed and intended to create the impression (1) that eighty puzzles comprised the contest, (2) that the contest, though simple in nature, would be decided on the strength of the puzzles and without recourse to letter-writing, and (3) that it would cost not more than three dollars to become eligible for a prize.

Appellant does not claim that any statement in the advertisements was untrue or that there was any departure from the procedure announced in the Official Rules of the Contest. There is no claim by him that the judging of the letters was to be other than bona fide, or that any contestant failed to receive the promised books. No contestant, so far as the record shows, complained of being misled or defrauded. In other words, the fraud order is not premised upon specific or affirmative misstatements, or upon failure to perform as promised, but is premised upon an impression which appellant says is conveyed by the advertisements as a whole. He derives the impression from the headlines in the advertisements and the comparative urgency which he finds in some of the expressions in them.

The statutory clause under which appellant acted, authorizes him to forbid the use of the mails to any person or company conducting any "Scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises." [1]

Findings of the Postmaster General in cases of this sort will not be disturbed by the court where they are fairly arrived at and have substantial evidence to support them.[2] Furthermore, "Even if an advertisement is so worded as not to make an express misrepresentation, nevertheless, if it is artfully designed to mislead those responding to it, the mail fraud statutes are applicable."[3] It is upon the latter rule that appellant relies in the case at bar.

The rule is broad; a false pretense, representation, or promise may be

---

[1] R. S. § 3929, 39 U.S.C.A. § 259.
[2] Farley v. Simmons, 1938, 69 App.D.C. 110, 114, 99 F.2d 343, 346, 347, and cases there cited.
[3] Id., 69 App.D.C. at page 113, 99 F.2d at page 346.

made by impression. But such impression must be fairly derived. As we said in Farley v. Simmons,[4] the question is what the advertisement is "Reasonably intended to cause the reader thereof to believe."

To support appellant's conclusion in this case, one must ascribe to the advertisements an impression directly contrary to the stated rules of the contest. One must thus assume that readers were led not to read the Rules, or were led to ignore them or to misunderstand them or to believe something else contrary to their statement. There is no evidence, we think, to support any of those assumptions. The Rules were legibly printed. They were emphasized, rather than minimized, in the text. They were clear to any reasonable mind. No contradictory expressions occurred elsewhere.

That this contest was an advertising device designed to promote the book-publishing business of appellees must have been plain to the most casual reader. The advertisements specifically told him, "This contest with FACTS MAGAZINE as sponsor, is being presented as a means of popularizing the Literary Classics Book Club." Moreover, the puzzles presented were so simple that patience and time were obviously the only requirements for the successful solution of the whole series. It is impossible to believe that any prospective contestant could think that only one person would be successful in the solutions. He was told in the Rules that the sponsors anticipated that a "large number" of persons would solve all the puzzles, and his own impressions must have told him the same thing.

We fail to see that the letters which were written to the contestants who successfully solved the first series of puzzles, cast any complexion upon the venture different from that cast by the original advertisements themselves.

■ We are told that the Postmaster General must be sustained if his action is within "The most malign interpretation which can in reason be put on" the advertisements, the quoted words being from an opinion of Judge Learned Hand while on the District Court in 1909.[5] But that broad expression is limited by "in reason," and the judge's further description of the Postmaster General's power was circumscribed by the words "reasonably conclude."[6] We think that it must necessarily be contemplated that any reasonable person proposing to enter a contest would read the rules if he were cautioned to do so, and would understand plain terms in them. To be within reason even the most malign impression must proceed from that minimum premise. If the Postmaster General's power were coextensive with the most malign impression to which advertisements might be susceptible, contrary to unambiguous terms plainly stated, he would be the unrestricted master of much of the country's business. We do not find that power in the simple and explicit language of the statute, which is limited to false or fraudulent pretenses, representations, or promises. Advertisements which are clearly not false or fraudulent frequently have a certain extravagance and urgency in their appeals, which to the most malign, and even to the mildly cynical, are beyond the boundary of precise accuracy. If a general impression contrary to terms plainly stated is to be the basis for a fraud order, it must, we think, be the impression reasonably conveyed to the public to which the advertisement is addressed. The impression which is the criterion is that of a reasonable reader, not the most malign impression uninhibited by reason. We so held in Farley v. Simmons.[7]

■ We think that the advertisements before us fairly urged contestants to read the Rules and that the Rules stated fairly, in style of type, placement, and terms, what was proposed. That being so, and there being no ambiguity in or departure from the proposals stated, a finding of false pretenses, representations, or prom-

---

[4] 69 App.D.C. at page 114, 99 F.2d at pages 346, 347.

[5] Putnam v. Morgan, C.C., 172 F. 450, 451.

[6] See our discussion of the same quotation in Farley v. Simmons, 1938, 69 App. D.C. 110, 114, 99 F.2d 343, 347.

[7] 1938, 69 App.D.C. 110, 99 F.2d 343.

ises could not properly be made. Legally speaking, that conclusion upon these facts was arbitrary and capricious.

We think that the District Court was correct in its judgment.

Affirmed.

EDGERTON, Associate Justice (dissenting).

The falsity of appellees' advertising seems to me as clear as its truth seems to the majority of the court. The question before the court is not whether my view is right but whether it is reasonable.

Any language or conduct that is intended to convey a false impression is a false pretense. No special form is necessary. I think appellees, in several advertisements, made false pretenses concerning the nature of the contest, its extent and duration, and its cost to contestants. I shall discuss only one advertisement and only one sort of pretense.

The puzzles were simple. Appellees knew from experience with similar contests that thousands of contestants would solve all the puzzles correctly; that it was impossible to win a prize merely by solving puzzles; and that prize winners would be chosen from among thousands of persons on the basis of a letter-writing contest. So much is plain and undisputed.[8]

It follows that if appellees intended to convey to all or any of their readers either (1) the idea that the contest was merely a puzzle contest or (2) the idea that there was a substantial chance that prizes would be won merely by solving puzzles, appellees made a false pretense. The fraud order must be sustained if the Postmaster General could reasonably find either of those intents. Either is plainly material, since a person who is willing to risk his money in a puzzle contest may be unwilling to risk it in a letter-writing contest and a person who is willing to face a possibility that puzzles may not be decisive may be unwilling to face a certainty that they will not be decisive.

Exhibit 1 is a full-page tabloid-size advertisement which appellees published in Newsday on April 3, 1945. Across the top of the page is printed in large black letters "Solve the 4 Puzzles NOW—Mail Entry By Saturday Night, April 7th," and then "$10,000 FIRST PRIZE—PUZZLE CONTEST." The words "PUZZLE CONTEST" are in letters nearly an inch high. Next comes, in type much smaller than these headlines but much larger and heavier than the body of the advertisement: "Win $10,000, $2,000, $1,000 or Any of 500 Cash Prizes in FACTS Magazine's New, Delightful Puzzle Contest. SOLVE THESE 4 PUZZLES NOW! Write your solutions on the Entry Form below, and mail the Entry Form on or before Midnight, Saturday, April 7th!" Next follows a "SAMPLE Puzzle—Just to Give You the Idea," and then: "FACTS MAGAZINE Invites You To Enter This Puzzle Contest. Accept this cordial invitation from FACTS MAGAZINE to enter its puzzle contest. Here is your opportunity to win $10,000, $2,000, $1,000 or any of 500 cash prizes totaling $17,500." These invitations, and not merely the headlines which precede them, are in larger and heavier type than the body of the advertisement.

The right-hand column of the advertisement is largely occupied by the "sample puzzle" and by four other pictured puzzles. These puzzles consist largely of crude drawings. Like most drawings they catch the eye.

An "OFFICIAL ENTRY FORM" is a conspicuous part of the advertisement. It calls the contest a "Puzzle Contest" and states that "the additional puzzles" will be sent on receipt of the form. It refers to "the official rules" but it does not refer to the writing of letters.

So far there is no suggestion in the advertisement that the contest will, or may, involve the writing of letters. So far there is no qualification of the repeated and emphasized assertion that it is a puzzle

---

[8] Approximately 35,000 persons solved correctly the original group of 80 puzzles, and approximately 27,000 of these solved correctly all the puzzles in the first "tie-breaking" series. The Post Office proceedings prevented completion of a second tie-breaking series.

contest. Obviously the conspicuous parts of the advertisement convey, and are intended to convey, the idea that it is merely a puzzle contest.

The court's theory seems to be that appellees intended to correct, in the course of the advertisement, the false idea that they intended its conspicuous parts to convey. It seems to me clear that they intended not merely that all readers should get that false idea, but also that many readers should retain it, and that all readers should retain, at the very least, the false idea that there was a substantial chance that prizes would be won merely by solving puzzles. This inference is, at least, one that the Postmaster General might reasonably draw. This is true because (1) the advertisement does not emphasize, but on the contrary diverts attention from, any language which mentions the writing of letters, and (2) even that language does not say that winners are, but clearly intimates that they are not, *certain* to be chosen on the basis of a letter-writing contest. Either of these facts alone is sufficient to support the Postmaster General's inference of fraud and therefore the fraud order. Both together are doubly sufficient.

(1) The words "The Rules are printed in full below. Please read them carefully and be sure you understand them" are in fine print, twelve lines to an inch, near the middle of the page. Attention is diverted from these words by their being printed at the end, not the beginning, of the paragraph in which they occur. The earlier and longer part of the paragraph deals with puzzles alone. This context conveys, not too subtly, the suggestion that the Rules likewise deal with puzzles alone.

The writing of letters is nowhere mentioned in type that is large or heavy or prominently placed. It is mentioned only in the Rules. The Rules are in fine print, twelve lines to an inch, in the lower left-hand corner of the page. They contain almost a thousand words divided into ten numbered paragraphs. The quotation on which the court relies, beginning with the words "In case of ties * * *" and ending with the words " * * * the conclusion of the contest," is a part of paragraph 9 of the Rules. That paragraph is the longest of the ten and therefore the least likely to be read in its entirety. It does not begin with the language which the court quotes. It begins with these words: "Neatness will not count. Do not decorate your answers. Just submit your solutions in accordance with the rules." Nothing could be better calculated to suggest to a prospective contestant (a) that the remainder of the paragraph, like its opening sentences, is unimportant and need not be read, and (b) that the remainder of the paragraph, like its opening sentences, deals only with "answers" and "solutions." Then follows, beginning in the middle of a line of fine print, with nothing to emphasize it or draw the reader's attention to it, the language which the court quotes and on which the court relies. It would have been easy for appellees to print this language in large type, or in heavy type, or to begin a paragraph with it, or to devote an entire paragraph to it, or to do several of those things. From any point of view but one and for any purpose but one, the importance of this language clearly demanded that attention be called to it in some way, since it was the only language in the entire advertisement which tended to qualify the numerous and conspicuous assertions of the headlines, the large type, the pictures, and the entry form that the contest was a puzzle contest. Instead of emphasizing this vital language, appellees did the opposite. They hid it as effectively as they could. In setting it in fine print, near the bottom of the page, in a paragraph introduced by matter both unrelated and unimportant, what can have been their purpose, except to prevent as many prospective contestants as possible from finding out that the contest might involve letter writing? No answer has been suggested. Unless the Postmaster General acted capriciously in drawing the only inference that has been suggested as possible, his fraud order must be sustained.

(2) If a prospective contestant discovered the language on which the court relies, and carefully read every word of it, he would learn that the "puzzle contest" was likely to end in a letter-writing contest for which a large number of persons might

be eligible. But he would not learn that thousands of persons were certain to be eligible, or even that any letter-writing contest at all was certain to be required. Nothing of that sort is stated anywhere, not even by the hidden language on which the court relies. On the contrary, that very language intimates, clearly and repeatedly, that ties in the solving of puzzles may or may not occur and that although the prizes may not, on the other hand they may, be won by the solving of puzzles alone: "*In case* of ties, *if* two or more persons tie in submitting the correct solutions"; "*if necessary*, a second tie-breaking group of puzzles"; "*In case* a second tie-breaking group of puzzles is necessary"; *Only in case* ties exist after such final tie-breaking puzzles have been checked will the letters be considered"; "the sponsor *anticipates* that a large number of persons *may* enter the contest and that a large number *may* solve, one, two or all three of the Groups of puzzles." [Italics supplied.] The court says that prospective contestants were "told in the Rules that the sponsors anticipated that a 'large number' of persons would solve all the puzzles." I cannot find this statement in the Rules. In other words I do not agree with the court that "may" means "will."

For the foregoing reasons it seems to me clear that (1) the advertisement was intended and apt to convey to many contestants the false idea that the contest was merely a puzzle contest and (2) the advertisement was intended and apt to convey to all or nearly all contestants, including entirely reasonable and careful ones, the false idea that there was at least a substantial chance that prizes would be won merely by solving puzzles.

The court finds that no reasonable reader of the advertisement would think that prizes might be won merely by solving puzzles. Obviously this finding of fact seems to me erroneous. Many readers lacked the knowledge, based on experience with similar contests, which appellees had and this court now has. Moreover, I think the court's finding is immaterial. To say that it invalidates the fraud order is equivalent to saying that if a scheme would not deceive reasonable men, to whom it is not primarily addressed, it may legally be used to take money from children and other simple people. The advertisement is primarily addressed to such people, since they are the ones likely to be attracted by crude and easy puzzles. "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." [9]

The court says: "As we said in Farley v. Simmons, the question is what the advertisement is 'reasonably intended to cause the reader thereof to believe.'" Despite other language in the prevailing opinion, that appears to be the question which the court actually decides. But it is not the question before the court. It was the question before the Postmaster General. That is what we said in Farley v. Simmons. I think the court now confuses the Postmaster General's function with our own. The question before us is not what the advertisement was intended to cause the reader to believe, but what the Postmaster General could reasonably find that it was intended to cause the reader to believe. As Judge Learned Hand and this court have said, the Postmaster General was entitled to put "the most malign interpretation which can in reason be put" on appellees' advertisement.[10] Conceding for the sake of argument that there may be some doubt whether appellees intended to convey a false idea, I do not see how there can be any doubt that the Postmaster General might reasonably find what he found. Neither, apparently, does appellees' counsel. We asked counsel whether he argued that no reasonable man could conclude that appellees intended to convey the idea that their contest was exclusively a puzzle contest. He replied: "Of course we must concede that *a* reasonable man might draw that conclusion, but we contend that *the* reasonable man would not draw *it*."

---

[9] Federal Trade Comm. v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141.

[10] Putnam v. Morgan, C.C., S.D.N.Y., 172 F. 450, 451; Farley v. Simmons, 69 App.D.C. 110, 115, 99 F.2d 343.