IRVING WEIS & CO. et al. v. BRANNAN,
Secretary of Agriculture.

No. 39, Docket 20980.

United States Court of Appeals
Second Circuit.

Dec. 7, 1948.

Harold H. Corbin, of New York City (Corbin, Bennett & Delehanty and Edward J. Bennett, all of New York City, on the brief), for petitioners.

Neil Brooks, Sp. Asst. to Atty. Gen. (J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., Lewis A. Sigler, Asst. Associate Sol., and Benjamin M. Holstein, Atty., U. S. Dept. of Agriculture, both of Washington, D. C., and John F. X. McGohey, U. S. Atty., of New York City, on the brief), for respondent.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is a proceeding to review an order of the Judicial Officer of the Department of Agriculture, acting for the Secretary of Agriculture, suspending petitioners' registration and trading privileges for a ten-day period for violation of § 4 of the Commodity Exchange Act, 7 U.S.C.A. § 6, and § 1.37 of the regulations, 17 CFR 1.37, issued under the Act. These prohibit dealings in commodity futures except through members of designated boards of trade by contracts and accounts of record showing, among other things, the true name and address of the trading customer.[1] The order in question was based upon a finding that petitioners had failed to keep a record of the true name of a customer.

During the latter part of May, 1945, one Reuben McGuigan, also known as E. L. McGuigan, approached petitioner Cycleman, as managing partner of petitioner Irving Weis and Company, with the request that a trading account be opened for him in the maiden name of his wife, Edith Adelson. According to Cycleman's testimony, he explained that he was publishing a market news report, and he wanted to prevent those who did not purchase his report from obtaining the same information through observation of his activities on the market. Cycleman then instructed McGuigan to obtain a trading power of attorney executed by his wife. When he received the instrument, with a check for $1,200, signed by McGuigan in his presence, "Edith Adelson by Reuben McGuigan," Cycleman opened an account for McGuigan in the Adelson name. From June 14, 1945, to November 14, 1945, petitioners executed a number of commodity exchange transactions for McGuigan. They recorded these transactions in their ledgers under the name of Edith Adelson. There was nothing on the face of the ledger sheets to indicate any other interest in the account or to refer the examiner to any other source of information. All cash payments on transactions in the account were made to McGuigan, and checks issued to the order of Edith Adelson were so endorsed by petitioners that they could be cashed by him, although his trading authority did not authorize them to pay any funds out of the account to him. The cash vouchers for payments to McGuigan carried the

---

[1] Sec. 4 of the Commodity Exchange Act prohibits dealings in commodities for future delivery except "where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a 'contract market,' as hereinafter provided in this chapter, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: Provided, That each board member shall keep such record for a period of three years from the date thereof, or for a longer period if the Secretary of Agriculture shall so direct, which record shall at all times be open to the inspection of any representative of the United States Department of Agriculture or the United States Department of Justice."

Sec. 1.37 of the regulations requires each futures commission merchant and each member of a contract market to "keep a record in permanent form which shall show for each commodity futures account carried by him the true name and address of the person for whom such account is carried and the principal occupation or business of such person as well as the name of any other person guaranteeing such account or exercising any trading control with respect to such account. Such record shall be open to inspection by any authorized representative of the Commodity Exchange Administration."

Adelson name only, and indicated that her account was to be charged.

On November 15, 1945, at McGuigan's request, petitioners closed the Adelson account and transferred the balance, in the amount of $19,500, to a new account for McGuigan, to which was given the fictitious name of Louis J. Burnstein, with a fictitious address. At that time, and at petitioners' offices, McGuigan executed a customer's card, which he signed with the Burnstein name and dated back to July 20, 1939. On November 15, again at McGuigan's request, petitioners closed his "Burnstein" account and made out a check to "Burnstein," endorsed so that McGuigan could cash it. At the same time they opened a new account for McGuigan in his own name, with substantially the same opening balance as the closing balance in the "Burnstein" account. This account was closed on January 15, 1946. McGuigan's trading privileges were subsequently suspended for price manipulation in commodity futures. In re Reuben Earl McGuigan, 5 Agric. Dec. 249, 5 Agric. Dec. 525 (1946).

During the latter part of October and the first part of November, 1945, the Commodity Exchange Authority conducted a regular periodic examination of petitioners' records. This examination did not uncover information that the Adelson account might be owned or controlled by another, and no such information was volunteered. The examiners limited their scrutiny to the face of ledgers except where their face indicated a code or trade name other than a natural name. Of five hundred accounts of customers trading through petitioners in regulated commodities under the Act, only McGuigan's account was carried in a natural name other than that of the owner. The Chief Accountant for the New York office of the Authority testified that he had never known of a case "where an account was carried in the name of a natural person which name was a trade name."

During November, 1945, the Authority learned from outside sources that some connection existed between Edith Adelson and Reuben McGuigan, and questioned petitioners about the Adelson account. They received in answer evasive and false statements. Petitioners made use of the trading authority, which McGuigan had procured at their instance from his wife, to explain the connection between the two; and petitioners claimed that all payments on the account were made to Edith Adelson. Not until January 25, 1946, in the course of a further conversation with representatives of the Authority, did petitioners answer direct questions in such a way as to show that the Adelson and McGuigan accounts were one and the same, or produce records to indicate the true ownership of the Adelson and Burnstein accounts. These records, which petitioners claimed had always been available for inspection, took the form of two 3 x 5 cards from a card index file of customers maintained by them. One of the cards bore the name of Edith Adelson, her address, and the name "E. L. McGuigan," preceded by a code number indicating that McGuigan "controlled" the account. The other card bore the name and address of Reuben L. McGuigan and, among other information, the heading, "Trade Names" over the names of Edith Adelson and Louis J. Burnstein. The Edith Adelson name was followed by the symbol "P/A," which would indicate that McGuigan merely held a power of attorney from her. A third card, with the name of Louis J. Burnstein, was not produced until October 9, 1946, the day of the hearing below. It was not introduced into evidence.

Petitioners contend that the statutory requirement of a written record refers only to the brokers' memoranda on the floor of the Exchange. The contention is clearly refuted both by the language of the regulation under the Act and by the practice in the trade. See Baer and Woodruff, Commodity Exchange, c. 4, 1929. Petitioners argue that the investigators for the Authority should have gone beyond the ledger sheets to ask whether the Adelson account was being carried under a trade name or there were other records of the true owner. The argument is plainly unreasonable where the "trade name" was a natural name, with an appropriate address, and did not suggest or imply that the ledger entry for the account was untrue. Although a code name may be properly used in the ledger where there is a clear reference to the true name record, "the fact that * * * falsity

may be exposed by an examination of other books of account, does not render it any the less a false entry." United States v. Britton, 107 U.S. 655, 664, 2 S.Ct. 512, 520, 27 L.Ed. 520. And cf. United States v. Selman-Reinstein, Inc., D.C.Minn., 52 F.Supp. 208.

■ But even if the investigators had gone to petitioners' card file and had found the cards later produced, they would not have obtained information sufficient to meet the requirements of the statute, since the Adelson card showed only that one E. L. McGuigan held a power of attorney for her account; and the card for Reuben McGuigan had a similar notation. In view of these facts and of the pattern of concealment and evasion running through petitioners' actions, we are not justified in holding the finding below that the cards in question were not actually prepared until after the investigators had inspected the accounts to be unsupported by the evidence. We conclude therefore that the Judicial Officer was amply justified in his finding of a violation of the Act and regulations against the petitioners.

Petitioners also object to the punishment visited upon them, contending that the suspension of registration and trading privileges even for the brief period of ten days was unduly harsh and disruptive of their business. As a matter of fact the referee who took the testimony was impressed with their contentions in this regard at least, so that, while he recommended the findings of violation of the regulations and statute, he recommended only a three-day suspension of trading privileges, which should itself be suspended, pointing out that the firm handled a volume of sales which amounted to a gross profit of approximately $3,000 per day. The attorney for the Authority took exception to this decision that "because a violator does a large volume of business he should suffer no effective penalty" and said that such a standard would be an embarrassing precedent as a departure from impartial administration and a grant of practical immunity to large firms to disregard the Act. The Judicial Officer carefully reviewed these contentions, pointed out that this was not a "borderline case," but "the

violations found are serious and were purposeful, not merely technical," and held that though it was "never pleasant to order sanctions such as a suspension of registration," yet fair and impartial administration of the Act so required. The final order therefore provided for a ten-day suspension of the registration of Irving Weis and Company as a futures commission merchant and of Irving Weis as a floor broker under the Commodity Exchange Act, 7 U.S.C.A. § 1 et seq., and that "all contract markets shall refuse all trading privileges thereon to Irving Weis, Irving Weis and Company, and Alexander Cycleman" for a like period. Weis and Cycleman were the two active partners, both of whom had testified in the proceeding; the other two partners, Joseph Mark and Morris Weiss, were not parties to the proceeding, did not appear therein, and no order ran against them individually.

■ Judicial review of remedies or penalties set by regulatory administrative agencies is strictly limited. "It extends no further than to ascertain whether the Commission made an allowable judgment in his choice of the remedy. * * * It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 612, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888, per Mr. Justice Douglas; Deer v. Federal Trade Commission, 2 Cir., 152 F. 2d 65, and cases cited. Here the penalty so carefully considered by the agency charged with the responsibility seems well within the limits of its sound and informed discretion. No question as to the suspension of the partnership (as distinguished from that of the named partners), absent proof of knowledge or participation by all four members, can here arise, since the Act is specific in providing that "the act, omission, or failure" of any person acting for a partnership within the scope of his employment shall be deemed the act, omission, or failure of the partnership. 7 U.S.C.A. § 4. Hence we see no basis upon which an appellate court would be justified in substituting its own view as to the appropriate punishment.

Order affirmed.