**ALBERTY et al. v. FEDERAL TRADE COMMISSION.**

No. 9843.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 7, 1949.

Decided March 20, 1950.

Mr. Carl McFarland, Washington, D. C., with whom Messrs. Ashley Sellers and Kenneth L. Kimble, Washington, D. C., were on the brief, for petitioners.

Mr. Donovan R. Divet, Special Attorney, Federal Trade Commission, Washington, D. C., with whom Mr. W. T. Kelley, General Counsel, Federal Trade Commission, and Messrs. Walter B. Wooden and James W. Cassedy, Associate General Counsel, Federal Trade Commission, Washington, D. C., were on the brief, for respondent.

Before WILBUR K. MILLER, PRETTYMAN and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition to review an order of the Federal Trade Commission. Petitioners are engaged in selling food and drug products. They were charged by the Commission with disseminating false advertisements amounting to unfair and deceptive acts or practices in commerce. Four products are involved in this petition. They are Oxorin Tablets, Zen, Vitamin A Shark Liver Oil, and Alberty's Phospho B. After hearing, the Commission made detailed findings and issued a cease and desist order. Petitioners contest the validity of two clauses contained in parts of the order.

The Commission found that typical of the advertisements in respect to Oxorin are:

"Pep up your blood! Iron * * * A principal factor in Red Blood Cells * * * The disease Fighting Units of the Blood."

"When you are weary, tired, run-down, just dragging yourself around with no am-

bition left, when every effort you make seems to leave you weak and spent then try Oxorin Tablets, a tonic for the blood."

The Commission found as a fact that these tablets have no beneficial effect upon the blood except in cases of simple iron-deficiency anemia and that there are many causes of run-down conditions and lack of energy which will not be beneficially affected by the tablets. Petitioners do not object to that portion of the cease and desist order which forbids them to represent "That the preparation 'Oxorin Tablets' will have any therapeutic effect upon the blood or the red corpuscles thereof, except in cases of simple iron deficiency anemia; or that said preparation will relieve, correct, or have any beneficial effect upon the condition of lassitude characterized by such expressions as 'weariness', 'tiredness', 'weakness', 'lack of energy', or 'general run down condition', unless such representation be expressly limited to symptoms or conditions due to simple iron deficiency anemia".

However, the Commission added to the foregoing the requirement that the advertisement also state "that the condition of lassitude is caused less frequently by simple iron deficiency anemia than by other causes and that in such cases this preparation will not be effective in relieving or correcting it." This additional clause is one of the two which are the subject matter of the petition for review. It is applied to other products as well as to Oxorin Tablets.

■ The Federal Trade Commission Act gives the Commission authority to prevent persons from using unfair or deceptive practices in commerce,[1] provides that the dissemination of false advertisement is an unfair or deceptive practice in commerce,[2] and defines a false advertisement as one which is misleading in a material respect.[3]

1. 38 Stat. 719 (1914), 52 Stat. 111 (1938), 15 U.S.C.A. § 45 (a).

2. 52 Stat. 114 (1938), 15 U.S.C.A. § 52 (b).

3. 52 Stat. 116 (1938), 15 U.S.C.A. § 55 (a), reads: "The term 'false advertisement' means an advertisement, other than label-

ing, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the ad-

In determining whether the advertisement is misleading, failure to reveal facts made material by existing representations and failure to reveal facts made material by reason of the consequences of using the product are to be considered.[4] Thus, false advertising, by the terms of the statute, includes failure to reveal certain characteristics of the product which become important either because of certain things which are represented in the advertisement or because of consequences which arise from the use of the product. The Supreme Court has held that the act confers upon the Commission not only the powers specifically prescribed but all power falling within the penumbra of meaning in the statutory provisions. In Jacob Siegel Co. v. Federal Trade Comm.,[5] the Supreme Court held that in these cases "the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist."

. The question posed in the case at bar is not restricted to the peculiarities of these products. None involved is injurious or harmful in any sense. On the contrary, it is agreed that they have beneficial effects. The proposition that an advertisement should limit claims of beneficial effect to the causes for which the product is helpful—in the case of Oxorin Tablets simple iron-deficiency anemia—is not disputed. But the Commission says that these advertisers must go further and say that the condition of lassitude is caused less frequently by simple iron-deficiency anemia than by other causes and that in such cases the product will not be effective. In short, the Commission requires that the adver-

tiser tell the public that his product is more frequently valueless than it is valuable.

[2] If this rule applies to petitioners, it must also apply to all other products similarly advertised. The scope of the power thus claimed by the Commission will be seen if the advertisements which are currently customary in newspapers and magazines and on the radio are called to mind. Headaches, lack of energy, indigestion, and numerous other ailments may be due to any one or more of many causes, and remedies for these ills are usually beneficial only when the condition results from certain of those causes. It is admitted in this case that the Commission can require an advertiser of a product beneficial to a certain condition to specify which cause of that condition will yield to the product. But under the power claimed, the Commission could require every such advertiser to announce that in most cases the remedy will be useless. The question before us deals with an advertiser who states plainly that his product will aid a certain condition when that condition arises from one certain described cause. The question is whether that advertisement is, nevertheless, false and fraudulent unless it also states that frequently, or less frequently, or more frequently, the described condition springs from other causes which will not be reached by the product.

Even if we give effect to the broadest possible concept of the power conferred by the Congress upon the Commission, we do not think that the Commission has the power here claimed. There is a limit to the Commission's power. It is not given a general charter to police the expenditure

vertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual. No advertisement of a drug shall be deemed to be false if it is disseminated only to members of the medical profession, contains no false representation of a material fact, and includes, or is accompanied in each instance by truthful dis-

closure of, the formula showing quantitatively each ingredient of such drug."

4. Ibid. False advertising is defined in this section of the act for the purposes of Sections 12, 13 and 14. Section 12 (b), 52 Stat. 114 (1938), 15 U.S.C.A. § 52 (b) says that false advertising is an unfair or deceptive practice within the meaning of Section 5 of the act (supra note 1). Cf. Fresh Grown Preserve Corp. v. Federal Trade Comm., 2 Cir., 1942, 125 F.2d 917.

5. 1946, 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888.

of the public's money or generally to do whatever is considered by it to be good and beneficial. The task assigned it by Congress is specific, and it has no other authority in respect to this subject. False advertising is defined by the act as including failure to reveal facts made important, or of some consequence, because of other things claimed, and failure to reveal facts made important, or of some consequence, because of the results of the use of the product. The Commission must find either of two things before it can require the affirmative clause complained of: (1) that failure to make such statement is misleading because of the consequences from the use of the product, or (2) that failure to make such statement is misleading because of the things claimed in the advertisement. There is no such finding here.

Nor do we see how a derogatory addendum to the advertisement, such as that required here by the Commission, has any reasonable relation to the purpose of preventing the advertisements from being misleading. As we have pointed out, there are no harmful consequences from use of these products. The limitations imposed by the first part of the Commission's order reveal the stark, complete truth. In the case of Oxorin Tablets, petitioners can say that they help lassitude only if they specify lassitude due to simple iron-deficiency anemia. The Commission has found that such a statement is true. Moreover, it is the full truth. It is clear enough that an additional derogatory negative emphasizes the truth. No matter how clear and complete an affirmative statement is, it can be sharpened by a negative delimitation. Almost every advertisement of a food, drug or drink, no matter how accurately described and carefully limited in claims, would fall within the scope of the rule here sought to be established.

We are concerned with the scope of the power thus sought by the Commission. If it has this power, it could, if it chose, require an advertiser of a breakfast food rich in iron to state not only that the food is good for those deficient in iron but also that iron deficiency is less frequent than other ills and that for these others the ad-

vertised food is valueless; and similarly through the long list of foods, drugs and drinks good for one or a few of the ills of men but not for all. Such power seems to us to be no less than the power to control the marketing of all such products, because, if particular advertisers, selected by the Commission, can be required not only to state accurately the limited benefits of their products but also to call attention to what the products will not do, the effect on marketing is clear enough. Such a requirement seems to us to have no relation to the prevention of falsity in advertising. It is a wholly different power.

 Our dissenting judge says that "The Act's purpose is to encourage the informative function of advertising". That view reflects clearly the difference between us. We think that neither the purpose nor the terms of the act are so broad as the encouragement of the informative function. Both purpose and terms are to prevent falsity and fraud, a negative restriction. When the Commission goes beyond that purpose and enters upon the affirmative task of encouraging advertising which it deems properly informative, it exceeds its authority. Of course, the truth of an advertisement affects its informative function. But the scope and nature of the information contained in an advertisement involve many more considerations than its mere truth. It would be ideal from the buyer's point of view if all advertisements were required to describe the product with cold precision, to enumerate with fidelity its shortcomings, and to call attention to the circumstances in which it is valueless. And a plausible argument can be made that an advertisement is not really truthful unless it does all those things. But we think that the negative function of preventing falsity and the affirmative function of requiring, or encouraging, additional interesting, and perhaps useful, information which is not essential to prevent falsity, are two totally different functions. We think that Congress gave the Commission the full of the former but did not give it the latter. In our judgment, the Commission goes far across the line when it attempts to require the ad-

vertiser of a drug admittedly beneficial in one ailment to state affirmatively that there are other ailments not reached by the drug. This latter requirement is merely the encouragement of the informative function of advertising.

Congress has given us a definition of false advertisement and in it has specified the respects in which failure to reveal amounts to falsity. It has thus indicated, even though it has not prescribed precisely, the limits to which it meant the Commission could go. It seems to us that the limit of the Commission's power is to require that a product be truthfully represented, and that it has no power to require additional negative statements except as the act itself indicates, i. e., where the affirmative representations require further explanation or where the consequences of using the product require further warning. Neither of these specifications is present in the case at bar.

█ The other part of the Commission's order complained of relates solely to Phospho B. The Commission required that if the petitioners make any claim that this product possesses any therapeutic value in the treatment of sleeplessness, nervousness, etc., they must expressly limit such claims to "claims of value made for the preparation under the principles of the homeopathic school of medicine". The homeopathic school is one of the two generally recognized schools of medicine, and, although it has considerably less supporters in number than has the allopathic school, it is nonetheless respectably established and practiced. According to the principles of the homeopathic school, this particular product is a medicine. We do not think that failure to designate which of two established schools of medicine recognizes a product as beneficial is misleading and makes the advertisement false.

We hold that failure to include the two disputed clauses in the advertisements under consideration· is not false advertising under the Federal Trade Commission Act, and that the Commission has no power to enforce such requirements.

The statute gives this court power not only to affirm or to reverse but also to modify orders of the Commission.[6] The order under review is modified by striking from paragraph 1(d) the clause "and unless the advertisement reveals that the condition of lassitude is caused less frequently by simple iron deficiency anemia than by other causes and that in such cases this preparation will not be effective in relieving or correcting it", and eliminating from other paragraphs similar clauses; and by striking from paragraph 1(k) the phrase "under the principles of the homeopathic school of medicine". As thus modified, the order is affirmed.

Order modified and affirmed.

BAZELON, Circuit Judge (dissenting).

Ever since Congress decided that many of the problems of our complex economy should be entrusted to specialized agencies, courts have relied on notions of "self-restraint" and "special competence" to limit their review of agency action. This was tacit recognition that no court could match the skill, time and selectivity which are brought to bear upon any given problem by an agency especially established and equipped for that purpose. A direct outgrowth of this development was a reorientation in judicial thinking, fundamental to which was the distinction between that which one finds personally acceptable or "reasonable" and that which falls within the bounds of acceptability or "reasonableness." The former tends to approximate the relatively subjective decision of the administrator himself; the latter represents merely a determination of whether the action under scrutiny bears some rational connection with the facts. This distinction—between that which is personally acceptable and that which is within the bounds of acceptability—is often difficult to grasp, but it is hardly new to the law. For example, members of a jury are required, in negligence cases, to apply the standard of conduct observed··by a "reasonable man," who represents a community ideal, rather than to measure the tortfeasor's conduct by what they themselves

6. 38 Stat. 719 (1914), 52 Stat. 111 (1938), 15 U.S.C.A. §§ 45(c) and 45(d).

would do under the same circumstances. See Holmes, The Common Law 111, 1881.

Although judicial deference to administrative expertness was first applied in the area of fact-finding, it has been extended to the matter of remedy as well. In a series of cases involving orders of the National Labor Relations Board, the Supreme Court held that the Board's choice of remedy would not be disturbed, absent a clear showing of abuse of discretion.[1] And the same was true of Securities and Exchange Commission dissolution orders under the Public Utilities Holding Company Act;[2] and of the orders of other administrative agencies.[3]

Since this development post-dated the enactment of the Federal Trade Commission Act and its grant of authority to Courts of Appeals to "modify" orders of the Commission, 15 U.S.C.A. § 45(b), there arose a need for reexamination of the case law in this area. In Herzfeld v. United States, 2 Cir., 1944, 140 F.2d 207, which involved a prayer for review of a Federal Trade Commission order prohibiting false advertising, the court refused to follow the precedent of modification established in Federal Trade Commission v. Royal Milling Co., 1933, 288 U.S. 212, 218, 53 S.Ct. 335, 77 L.Ed. 706. Judge Learned Hand, speaking for the Second Circuit, said that since the Royal Milling Co. case was decided, "the Supreme Court has as much circumscribed our powers to review the decisions of administrative tribunals in point of remedy, as they have always been circumscribed in the review of facts. Such tribunals possess competence in their special fields which forbids us to disturb the measure of relief which they think necessary. In striking that balance between the conflicting interests involved which the remedy measures, they are for all practical purposes supreme. [Citing cases] It is true that all these decisions concerned the Labor Board, but that tribunal does not enjoy a position of peculiar authority, as the court has indicated in other connections. [Citing cases] * * * Congress having now created an organ endued with the skill which comes of long experience and penetrating study, its conclusions inevitably supersede those of courts, which are not similarly endowed." 140 F.2d at page 209.[4]

It seems to me that, by its disposition of Jacob Siegel Co. v. Federal Trade Commission, 1946, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888, the Supreme Court has tacitly narrowed its own decision in the Royal Milling Co. case to such an extent that it

---

1. See, e. g., International Ass'n of Machinists v. National Labor Relations Board, 1940, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; Virginia Electric & Power Co. v. National Labor Relations Board, 1943, 319 U.S. 533, 543, 63 S.Ct. 1214, 87 L.Ed. 1568; Franks Bros. Co. v. National Labor Relations Board, 1944, 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020.

2. 15 U.S.C.A. § 79 et seq.; American Power & Light Co. v. Securities and Exchange Commission, 1946, 329 U.S. 90, 115–116, 67 S.Ct. 133, 91 L.Ed. 103.

3. See, e. g., Board of Trade of Kansas City v. United States, 1942, 314 U.S. 534, 548, 62 S.Ct. 366, 86 L.Ed. 432; Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 227–229, 63 S.Ct. 589, 87 L.Ed. 724, 158 A.L.R. 832; Northwestern Electric Co. v. Federal Power Commission, 1944, 321 U.S. 119, 124, 64 S.Ct. 451, 88 L.Ed. 596; Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 593, 69 S.Ct. 278; cf. Gray v. Powell, 1941, 314 U.S. 402, 412–413, 62 S.Ct. 326, 86 L.Ed. 301.

4. Followed by the Second Circuit in Parke, Austin & Lipscomb v. Federal Trade Commission, 1944, 142 F.2d 437, 442, certiorari denied 323 U.S. 753, 65 S.Ct. 86, 89 L.Ed. 603; Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 2 Cir., 1944, 143 F.2d 676, 680; Deer v. Federal Trade Commission, 2 Cir., 1945, 152 F.2d 65, 67; cf. Irving Weis & Co. v. Brannan, 2 Cir., 1948, 171 F.2d 232, 235; by the Third Circuit in Siegel Co. v. Federal Trade Commission, 1944, 150 F.2d 751, 755–756, (discussed infra); Perloff v. Federal Trade Commission, 3 Cir., 1944, 150 F.2d 757, 760. See also Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 726–727, 68 S.Ct. 793, 92 L.Ed. 1010.

is drawn within the rationale expressed by Judge Hand in the Herzfeld case. In the Siegel case, the Federal Trade Commission had ordered Siegel to cease and desist from using its trade name because of certain misrepresentations contained therein. Petitioner, citing the Royal Milling Co. decision, asserted that so valuable a right as a trade name should not be destroyed if qualifying words might cure the misrepresentation. The Third Circuit held, however, that it was powerless to disturb the remedy, following the Herzfeld case. Jacob Siegel Co. v. Federal Trade Commission, 3 Cir., 1944, 150 F.2d 751, 755–756. The Supreme Court reversed, relying in large part on the fact that, by being prohibited from further use of a valuable trade name, petitioner was being deprived of a valuable business asset. Mr. Justice Douglas, speaking for a unanimous Court, stated: "The Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices in this area of trade and commerce. Here, as in the case of orders of other administrative agencies under comparable statutes,[5] judicial review is limited. It extends no further than to ascertain whether the Commission made an *allowable judgment in its choice of the remedy*. As applied to this particular type of case, it is whether the Commission abused its discretion in concluding that no change 'short of the excision' of the trade name would give adequate protection * * * The issue is stated that way for the reason that we are dealing here with trade names which, as Federal Trade Commission v. Royal Milling Co., * * * emphasizes, are valuable business assets. * * * The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." (Emphasis supplied.) 327 U.S. at pages 612–613, 66 S.Ct. at page 760. The Court did not, however, proceed to order the Commission to permit "proper qualifying words" as was done in the Royal Milling Co. case, 288 U.S. at page 217, 53 S.Ct. at page 337, but instead, remanded to the Federal Trade Commission, saying: "we are left in the dark whether some change of name short of excision would *in the judgment of the Commission* be adequate." (Emphasis supplied.) 327 U.S. at page 613, 66 S.Ct. at page 761. The inference to be drawn from the Supreme Court decision in the Siegel case seems to me to be that if the Commission had considered the possibility of qualifying words and found them insufficient to cure the misrepresentation, especially if no property in a trade name were involved, the Court would not interfere with the Commission's expert judgment, unless there was a clearly demonstrable abuse of discretion.

"The question before the court is not whether my view is right but whether it is reasonable."[6] Our function is limited to finding whether the remedy has a rational basis in the facts. Since I find such a rational basis, I am unable to agree with the majority that the Commission abused its discretion.

The Commission found that Alberty had falsely advertised that Oxorin Tablets had beneficial effects on lassitude, tiredness, etc.[7] Typical of these misrepresentations is the following advertisement:

"Pep up your blood! Iron * * * A principal factor in Red Blood Cells * * * The disease Fighting Units of the Blood.

---

5. Citing cases which are included in Notes 1 and 3, supra.

6. Judge Edgerton dissenting in Hannegan v. Read Magazine, 1946, 81 U.S.App.D.C. 339, 343, 158 F.2d 542, 546, reversed, Donaldson v. Read Magazine, 1948, 333 U.S. 178, 188, 68 S.Ct. 591, 92 L.Ed. 628.

7. The stipulation of facts reads: "* * * respondents have represented, directly and by implication, that by the use of 'Oxorin Tablets' the blood and the red corpuscles of the user will be rendered stronger, more vital and active and will perform their functions better, and that it will correct run-down conditions and bring back energy."

"When you are weary, tired, run-down, just dragging yourself around with no ambition left, when every effort you make seems to leave you weak and spent then try Oxorin Tablets, a tonic for the blood."

In truth as the stipulated facts show, the tablets had no such beneficial effects except when the designated symptoms were caused by iron deficiency anemia—and that was infrequently the case.[8] Thus, in deciding how best to remedy the falsehood without unnecessarily restricting petitioner from stating the "complete truth," the Commission carved out of the misrepresentation all that was false, expressly or impliedly. The resulting order enjoined petitioner to cease and desist from representing "That the preparation 'Oxorin Tablets' will have any therapeutic effect upon the blood or the red corpuscles thereof, except in cases of simple iron deficiency anemia; or that said preparation will relieve, correct, or have any beneficial effect upon the condition of lassitude characterized by such expressions as 'weariness', 'tiredness', 'weakness', 'lack of energy', or 'general run down condition', unless such representation be expressly limited to symptoms or conditions due to simple iron deficiency anemia and unless the advertisement reveals that the condition of lassitude is caused less frequently by simple iron deficiency anemia than by other causes and that in such cases this preparation will not be effective in relieving or correcting it."

If the Commission had considered only what affirmative statements could minimally be made to cure the misrepresentation, it would have ignored its statutory mandate. The Federal Trade Commission Act, as amended in 1938, specified that " * * * in determining whether any advertisement is misleading, there shall be taken into account (among other things)

not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also *the extent to which the advertisement fails to reveal facts material in the light of such representations* or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." (Emphasis supplied.) 52 Stat. 116 (1938), 15 U.S.C.A. § 55(a). It is clear from the italicized language that Congress realized that omissions could be as misleading as affirmative misrepresentations. With this in mind, I am unable to reject the Commission's finding that we have here a situation where, "In recommending a particular preparation [i. e., Oxorin] as a cure or remedy for certain designated ailments, symptoms or conditions [i. e., lassitude], respondents suggest not only that such ailments, or conditions may be due to causes for which the preparation is beneficial, but also that there is at least a reasonable chance that they are in fact due to such causes." To prevent such a suggestion from being accepted and relied on in a case where it would be false or misleading, as here, the Commission ordered "appropriate disclosure of the possibility of other causes of the ailments, symptoms or conditions."

It seems to me that, where the sin is one of omission, the Commission may find that it can be remedied only by eliminating any possibility that consumers may draw incorrect inferences in the future. Just as the flat statement "Oxorin is good for lassitude" requires the qualifying phrase, "when that symptom is due to iron deficiency anemia," so also might the Commission have concluded that this single qualification, without more, would raise the inference that, more probably than not,

---

8. Following is the stipulation of facts in this connection: "That 'Oxorin' will have no beneficial effect upon the blood or the red corpuscles thereof except in cases of simple iron deficiency anemia. There are many causes of run-down conditions and lack of energy which will not be beneficially affected in any way by 'Oxorin'." 
\* \* \* \* \* \* \*

"That the causes of lassitude described by such expressions as 'weary', 'tired', 'run-down', 'just dragging around,' 'no ambition left', 'slipping', 'all gone', and the like, are so numerous that in the aggregate they are due much less frequently to simple iron deficiency anemia than to other causes."

such a symptom *is* the result of iron deficiency anemia. To remove the possibility of this incorrect secondary inference on the part of consumers, the Commission may properly insert a second qualifying phrase.

Nor is such a decision on the part of the Commission completely without precedent. In a case under the Food and Drug Act which, according to the Court, forbids "every statement, design, and device [on a label] which may mislead or deceive," the Supreme Court said that "Deception may result from the use of statements not technically false or which may be literally true. The aim of the statute is to prevent that resulting from indirection and ambiguity, as well as from statements which are false." United States v. 95 Barrels of Vinegar, 1924, 265 U.S. 438, 443, 44 S.Ct. 529, 531, 68 L.Ed. 1094. It then upheld the view of the lower court that a label describing vinegar as "apple cider vinegar made from *selected apples*" gave rise to the inference that selected *fresh* apples were used. In reality, the vinegar was the product of *dried* apples. The omission was found to be misleading even though the two products were equally wholesome.[9]

Similarly, under the Federal Trade Commission Act, it was held that advertisement of defendant's " '6%' finance plan" tended to mislead the public into thinking that a simple interest charge of six per cent on unpaid balances was contemplated and, therefore, that a curative order was required. General Motors Corp. v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 33.[10]

As I view the development of the law in this field, the Commission is entitled to exercise the utmost caution rather than put the consumer to the risk of inquiry. The cases are almost legion which state that this statute was "made to protect the trusting as well as the suspicious. * * * the rule of *caveat emptor* should not be relied upon to reward fraud and deception." Federal Trade Commission v. Standard

Education Society, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141. The Commission's function is "to protect the casual, one might even say the negligent, reader, as well as the vigilant and more intelligent and discerning public." Parker Pen Co. v. Federal Trade Commission, 7 Cir., 1946, 159 F.2d 509, 511. Even if it is "only the careless or the incompetent [who] could be misled * * * if the Commission, having discretion to deal with these matters, thinks it best to insist upon a form of advertising clear enough so that, in the words of the prophet Isaiah, 'wayfaring men, though fools, shall not err therein,' it is not for the courts to revise their judgment." General Motors Corp. v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 33, 36. The Federal Trade Commission Act was not " 'made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous,' * * * and the 'fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced' * * *. The important criterion is the net impression which the advertisement is likely to make upon the general populace. * * * It is for this reason that the Commission may 'insist upon the most literal truthfulness' in advertisements." Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 2 Cir., 1944, 143 F.2d 676, 679–680.[11] It is, of course, almost axiomatic that " 'words and sentences may be literally and technically true and yet be framed in such a setting as to mislead or deceive.' " Sebrone Co. v. Federal Trade Commission, 7 Cir., 1943, 135 F.2d 676, 679.[12]

There are intimations in the majority opinion that if use of these products were to have harmful consequences, it might be permissible to add further qualifications than those considered adequate by the majority. Although such a distinction, between misleading advertisements which may

---

9. Cf. United States v. Six Dozen Bottles, etc., 7 Cir., 1947, 158 F.2d 667, 669.

10. See Judge Minton's dissent in D.D.D. Corp. v. Federal Trade Commission, 7 Cir., 1942, 125 F.2d 679, 682–683.

11. Aronberg v. Federal Trade Commission, 7 Cir., 1942, 132 F.2d 165, 167.

12. Cf. Donaldson v. Read Magazine, 1948, 333 U.S. 178, 188–189, 68 S.Ct. 591, 92 L.Ed. 628.

have harmful effects (beyond the useless expenditure of money) and those which do not, may be a desirable one, I do not believe it is established by the Act. The statutory language draws within its condemnation all "false advertisements." Failure to reveal facts becomes determinative of falsehood when they are "material in the light of such representations ['made or suggested by statement, word, design, device, sound, or any combination thereof'] or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." 15 U.S.C.A. § 55(a). Only the clause after the conjunction "or" adverts to considerations of harmfulness. The clause before it seems to me to authorize the Commission to require qualifying or explanatory statements whenever these may be necessary to remedy omissions found by the Commission to be misleading. Since the statute makes no provision for requiring a greater amount of truth when a product is harmful than when it is not, I think the majority are injecting an irrelevant criterion into the case.

Nor is this a case, like Royal Milling and Siegel, where the property right in a trade name would have been entirely lost if the Commission order had been permitted to stand. Perhaps, in such cases, there is need for greater scrutiny and for consideration of every available alternative before permitting so drastic a course.[13] But no such "right" is involved here. The Commission made no attempt to prevent petitioner from advertising that Oxorin Tablets had a beneficial effect on iron deficiency anemia. The circumscription was only with regard to a symptom, "lassitude," which is only infrequently caused by such deficiency.

It seems to me that the main thrust of the majority opinion is towards caution in interfering with the "right" to advertise. It decides that the Commission goes too far when its order "requires that the advertiser tell the public that his product is more frequently valueless than it is valuable." I do not find that a startling requirement when its function is to rebut a false or misleading inference that the product is more frequently valuable than it is valueless. In my view, the action taken by the majority overlooks the fact that Congress, by enacting legislation proscribing false and deceptive advertising, sought to remedy the consumer's patent inability to ascertain the merit of claims made by advertisers. The Act's purpose is to encourage the informative function of advertising; and the Commission's duty is to eliminate falsehoods. If that which is left after the elimination of all that is expressly or inferentially false is hardly worth saying, then, of course, it need not be said.[14]

These same considerations apply to the other part of the Commission's order complained of by petitioner. Phospho B, another of petitioner's products, has therapeutic value in the treatment of sleeplessness, nervousness, etc., only under the tenets of the homeopathic school of medicine. That school, as the majority points out, has considerably less supporters than has the allopathic school. For the reasons already discussed, I feel that it was within the discretion of the Commission to order that the public be informed of the limited medical support for the claims made by petitioner. To permit petitioner to continue its representations without restricting them to adherents of the homeopathic school is to "fail to reveal facts material in the light of such representations." 15 U.S.C.A. § 55 (a).

I think the order of the Commission should be affirmed without modification. But even if I were to accept the view of the majority, I think the proper procedure now would be to remand to the Commission for its reconsideration of the entire order in light of this court's rejection of the second qualifying clause. See Federal Trade Commission v. Morton Salt Co., 1948, 334 U.S. 37, 55, 68 S.Ct. 822, 92 L.Ed. 1196, 1 A.L.R. 2d 260.

13. See Churchill Tabernacle v. Federal Communications Commission, 1947, 81 U.S.App.D.C. 411, 415, 160 F.2d 244, 248.

14. Cf. American Medicinal Products v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 426, 427.